Case 1:18-cv-02208-TWP-TAB   49D14-1805-PL-017647   Document 1-1   Filed 07/18/18   Page 1 of 97 PageID #: 7
Marion Superior Court, Civil Division 14

Filed: 5/4/2018 5:30 PM
Myla A. Eldridge
Clerk
Marion County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | MARION SUPERIOR/CIRCUIT COURT |
| | ) SS: | |
| COUNTY OF MARION | ) | CAUSE NO. |

| | |
|---|---|
| ELI SABAG | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TRACK GROUP, INC., | ) |
| SAPINDA ASIA LIMITED, | ) |
| and LARS WINDHORST, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT

Plaintiff Eli Sabag ("Sabag") files this Complaint for Damages and Declaratory Judgment against Defendants Track Group, Inc., a Delaware corporation formerly known as SecureAlert, Inc. ("Track Group"), Sapinda Asia Limited, a British Virgin Islands Corporation ("Sapinda"), and Lars Windhorst, a German Citizen ("Windhorst"), and hereby alleges and states as follows:

## I.   PRELIMINARY STATEMENT

1.   In this action, Sabag seeks to enforce an "earn-out" clause in a Share Purchase Agreement ("SPA") under which Track Group, after acquiring Sabag's company (the "Acquisition"), was obligated to provide Sabag with up to $3 million of shares of Track Group stock if Track Group sold or leased a certain number of GPS prison tracking devices after the Acquisition (the "Contingent Stock").  Sabag also seeks to enforce the provisions of a put option agreement (the "Put Option Agreement") entered into between Sapinda and Sabag (and personally guaranteed by Windhorst), contemporaneous with the SPA with Track Group, under which Sapinda agreed to purchase the Contingent Stock awarded to Sabag for $20 per share.  Track Group is a publicly traded company that specializes in the sales of prison tracking devices and prison



EXHIBIT

A

monitoring services. Sapinda directly owned approximately 45% of the shares of Track Group. Windhorst owned 100% of the shares of Sapinda.

2.     Sabag alleges that (1) Track Group sold and leased a sufficient number of GPS prison tracking devices, within the meaning of the SPA, to warrant the partial or full payment of the Contingent Stock to Sabag and/or (2) Track Group, Sapinda, and Windhorst engaged in activities, with bad faith, to deliberately prevent Sabag from meeting certain earn-out milestones.

3.     Track Group, Sapinda, and Windhorst jointly negotiated the Acquisition with Sabag as a part of a "joint venture" so that Track Group could acquire a lightweight "flagship" prison tracking product from Sabag to make millions of dollars in additional profits. At the same time, however, Track Group purposely evaded its obligations to pay Sabag as much as $3 million in Contingent Stock. Sapinda and Windhorst purposefully evaded their obligations to pay Sabag as much as $18.75 million for the same Contingent Stock under the Put Option Agreement.

## II.     PARTIES

4.     Sabag is an Israeli citizen who is a resident of Cooper City, Florida. Sabag moved from Israel to Cooper City, Florida in March 2016.

5.     Track Group, formerly SecureAlert, Inc., is a publicly traded corporation organized under the laws of the State of Delaware, with a principal place of business located in Naperville, Illinois. Track Group's website indicates that the company maintains a substantial physical presence in Indiana through an office located at 22 N. Delaware Street, in Indianapolis. Track Group has entered into material contracts (that use Sabag's prison tracking devices) with government organizations located in Marion County, Indianapolis.

6.     Sapinda is a limited liability company organized under the laws of the British Virgin Islands, with a principal place of business located at OMC Chambers, Wickhams Cay 1, Road

2

Town, Tortola, British Virgin Islands.  As stated above, the sole shareholder of Sapinda is Windhorst.

7.      Windhorst is a German citizen last known to reside at 21 Chesham Place, SW1X 8HG, London, United Kingdom.

### III.      JURISDICTION AND VENUE

8.      This Court has personal jurisdiction over the Defendants pursuant to Indiana's long-arm statute, Indiana Trial Rule 4.4, and the Due Process Clause of the United States Constitution. Defendants conducted business in the State of Indiana.  Defendants supplied or contracted to supply services or goods in the State of Indiana.  The acts alleged and complained of in this Complaint were targeted, in part, with respect to acts within the State of Indiana, and specifically regarding activities surrounding dealings between Defendants and Marion County Community Corrections. Furthermore, Defendants had sufficient minimum contacts with the State of Indiana, either separately, or as "joint venture partners" who jointly negotiated (and jointly paid consideration for) the Acquisition which enabled Track Group to enter into a large revenue-generating contract with Marion County Community Corrections.  The minimum contacts of any one co-venture partner in a joint venture are attributable to other co-venture partners such that personal jurisdiction over one constitutes personal jurisdiction over all.  As such, Defendants have had sufficient minimum contacts with the State of Indiana, including by purposefully directing their activities at the State of Indiana, or availing themselves of the privilege to business within the State, and the injuries alleged in this Complaint are based, in part, on the forum related activities.

9.      In accordance with Ind. T.R. 75 (A)(4), Marion County is the preferred venue because it is where Track Group has an office location, or to which the claims hereunder relate or arose.

3

10.     This Court has jurisdiction over the parties and the subject matter pursuant to its power of general jurisdiction.

## IV.    FACTS

### Windhorst's Plan to Acquire the Shadow Device from Sabag For Track Group

11.     Sabag founded and was the sole shareholder of GPS Global Tracking and Surveillance System Ltd., an Israeli company that designed global positioning system tracking device technology and related software ("GPS Global").

12.     GPS Global invented, owned and marketed a unique, slimmer and more lightweight wearable tracking and monitoring device called the "Shadow."  The Shadow operates by emitting a GPS tracking signal which can be monitored electronically from remote locations.  The most common use for the Shadow is for the tracking and monitoring of criminals who have been placed on probation or who have been enrolled in special early-release programs.

13.     In 2013, Track Group's revenues, as a publicly traded company, were reported as approximately $15.6 million.  Track Group did not have many large contracts for its existing heavy-weight GPS tracking devices, and in the tracking device industry, the sale of monitoring services is often tied to the ability to provide the best tracking device hardware.

14.     Windhorst was aware of Track Group's underperformance, and he was on the lookout for cutting edge tracking devices, such as the Shadow, that could complement the operations of Track Group.

15.     Likewise, Sabag was interested to find new investors and markets for his company and his Shadow device.

4

16.     In August 2013, Sabag learned through a mutual friend that Windhorst was interested in setting up a business meeting to discuss a potential business collaboration between Sabag and Track Group.

17.     Although not previously known by Sabag, Windhorst was not listed as an officer or director of Track Group, and there is no indication in any SEC filings from Track Group that Windhorst, as an indirect shareholder of Track Group, was authorized to negotiate deals on behalf of Track Group.

18.     Yet, Windhorst invited Sabag to meet in London, England, and Sabag traveled and did meet with Windhorst there on October 6 through 8, 2013.

19.     During the meeting with Windhorst in London, Sabag was introduced to Tatiana Cohen ("Cohen"), who served as the Head of Business Development for the Sapinda Group.

20.     At the time of this meeting, Sapinda, wholly owned and controlled by Windhorst, was one of the largest single shareholders of Track Group.

21.     Sapinda was also a regular substantial source of lending to Track Group.  As of August 2013, Track Group was indebted to Sapinda in the approximate sum of $17.4 million. Later, that loan was converted by Sapinda into 3.9 million shares of Track Group common stock.

22.     During the meeting in London, Windhorst represented to Sabag that Track Group needed Sabag's technology, including the Shadow device, to save his multi-million dollar investment in Track Group.  As Windhorst described the situation, the company (Track Group) was "dying."  Windhorst proposed to purchase all of the shares of GPS Global from Sabag.  Windhorst also assured Sabag, who was living in Israel as a permanent resident, that he could continue to operate his company in Israel, as a wholly owned subsidiary of Track Group.

23.     To entice Sabag to consider a business transaction with Track Group and Windhorst, Windhorst represented to Sabag through his initial proposal that Sabag would receive (1) as much as $10 million in cash and shares of Track Group for his shares in GPS Global and (2) a substantial leadership role with Track Group (the "Proposed Acquisition").  Windhorst further represented that, after Track Group integrated Sabag's technology into Track Group's core offerings, the contemplated value of the Track Group shares would be worth at least $40 million.

**Windhorst, Sapinda, and Track Group**
**Make a Joint Offer to Sabag to Acquire GPS Global**

24.     After Windhorst met separately with Sabag in London for a few days to convince Sabag to continue discussions regarding the Proposed Acquisition, Windhorst then introduced Sabag in-person to Guy Dubois ("Dubois").

25.     Dubois was hand-picked by Windhorst to serve as Chairman and CEO of Track Group.  As stated in Track Group's public SEC filings, Dubois was appointed as Chairman to the Board of Directors of Track Group in December 2012, as "a requirement of a financing arrangement as part of the terms of a loan agreement with Sapinda Asia [Sapinda]."

26.     Cohen, a representative of Sapinda, actively participated in the same negotiations in London.

27.     During the London meetings, although Dubois was present, Windhorst lead the negotiations with respect to the overall terms, including price, for the Proposed Acquisition.

28.     When Windhorst mentioned that Track Group would pay for the Proposed Acquisition with shares of Track Group rather than cash, Sabag made it clear that at least $2 million of the deal consideration would be required in cash.

29.     Windhorst told Sabag that Track Group did not have $2 million in cash for the Proposed Acquisition, but Windhorst could take steps to personally convert any shares that Sabag

6

received from Track Group into cash.  The discussions led to Windhorst's offering of a put option agreement under which Sabag could "put" the shares that he received from Track Group to Sapinda for $20 per share, and Windhorst would personally guarantee the put option.

30.    At this point in time, Windhorst was negotiating with Sabag to have Track Group acquire Sabag's company by causing (1) the issuance of shares by Track Group to Sabag and (2) the acquisition of those shares by Sapinda (personally guaranteed by Windhorst).  These negotiations by Windhorst for the issuance and acquisition of Track Group shares were not known to any of the other shareholders of Track Group, and as discussed below, the final "put option" agreement was never disclosed in Track Group's SEC filings.

31.    As a material aspect of negotiations, Windhorst informed and assured Sabag that he had the financial means to personally guarantee his put option, and he promised to provide a personal bank letter to Sabag to confirm his financial capacity.

32.    On or about October 10, 2013, Sapinda's representative, Cohen, drafted a term sheet for the Proposed Acquisition at the request and direction of Windhorst.

33.    On or about October 11, 2013, Windhorst personally sent a term sheet to Sabag referencing it as a "Letter of Intent."

34.    Thereafter, Sapinda, through Cohen and Windhorst, actively negotiated the purchase terms with respect to Track Group's acquisition of GPS Global.  Sapinda's representative, Cohen, traveled to Israel to meet with Sabag at the GPS Global facility to work through an "action item list" for the Proposed Acquisition (i.e., due diligence items).

35.    On or about November 27, 2013, Track Group Chairman Dubois participated in a conference call with Sapinda to discuss revisions to a drafted "Letter of Intent" for the Proposed Acquisition.

36.     As of November 2013, Sapinda owned approximately forty-five percent (45%) of the shares of Track Group and was by far the largest single principal stockholder of Track Group at this time, with the next biggest shareholder owning eighteen percent (18%).

37.     On December 1, 2013, Track Group Chairman Dubois emailed Sabag and Sapinda, extolling the benefits of the Proposed Acquisition and Sabag's employment position after the closing.  Dubois referenced continued revisions to the "Letter of Intent," and he described Track Group and Cohen (Sapinda) as "very aligned," such that Sabag could refer any questions to Cohen if Dubois was not available (due to travel).

38.     The negotiations for the Proposed Acquisition continued leading to an email from Cohen to Sabag on or about December 8, 2013 wherein Cohen declared that Sabag had three options for the future of GPS Global:

> "1.     It decides not to do a deal and continue to go alone
> 2.     We team up with Secure Alert and Sapinda/Lars [Windhorst] and work together.
> 3.     You try to team up with someone else on the market."

39.     In the same email, Cohen wrote to Sabag:

> "I also believe we as a shareholder offer unique support to Secure Alert and therefore, it will be a right partnership for you with your mindset and the synergies offered by what [Track Group] has and GPS Global are very unique and it will be difficult to find a better partner to develop the company further and make it a market leader…I personally would like to offer you what I [Sapinda] and Guy [Dubois] believe will work for the Board of Directors …" (Emphasis Added)

40.     Cohen sent Sabag a "Letter of Intent" attached to the December 8, 2013 email outlining the terms of the Proposed Acquisition, which was set up for signature by Dubois as Chairman of the Board for Track Group.

41.     Hence, Cohen, who was acting on behalf of Sapinda, a company who was the single largest principal shareholder of Track Group and on whom Track Group relied upon as a significant source of lending, was negotiating on behalf of Track Group (a publicly traded company) for the acquisition of GPS Global, and in tandem promising the financial support of the acquisition by Sapinda and Windhorst, all of which was done with the knowledge and active participation of Track Group's Chairman of the Board, Dubois.

### Track Group's Purchase of Sabag's Outstanding Shares in GPS Global

42.     From late December 2013 through the date of the Acquisition, Cohen, Dubois, Windhorst and Sapinda remained actively involved in jointly negotiating and finalizing the terms.

43.     To further induce Sabag to complete the sale to Track Group and assuage any concerns about the financial backing of Sapinda, Windhorst directed his custodial bank, Shard Capital Partners, LLP ("Shard"), to issue a letter to Sabag.  On March 11, 2014, Sabag received a letter signed by JW E Lewis, Managing Partner of Shard, confirming "assets and cash position – proof of funds," of Sapinda to be "well in excess of USD 150 million."[1]  A true and accurate copy of the bank letter from Shard is attached as Exhibit 1.

44.     Those negotiations led Sabag to enter into a Share Purchase Agreement ("SPA") on March 12, 2014, with Track Group agreeing, among other things, to purchase all the outstanding shares of GPS Global.  A true and accurate copy of the SPA is attached as Exhibit 2.

45.     To induce Sabag to finalize the Acquisition, Sapinda, Track Group, and Windhorst arranged for the SPA to provide compensation to Sabag in the form of: (i) a modest up-front cash payment of $311,404.00, (ii) 84,078 "Initial Buyer Shares" of Track Group, (iii) 152,391 shares of "Restricted Stock" in Track Group, (iv) the Contingent Stock (which is the subject of this dispute)

---

[1] Unbeknownst to Sabag, in May 2017, Sapinda auditor and accounting firm Deloitte, delivered a letter of resignation to Sapinda, claiming that Shard supplied "deliberately false" information regarding Sapinda's financial position.

to be paid when certain "earn-out" requirements were met, and (v) $188,596 in loan repayments for prior debts of GPS Global.

46.     On March 16, 2014, Sapinda made an interest free loan to Sabag of $1.6 million that Sabag could repay to Sapinda after nine months with the "Initial Buyer Shares" that Sabag would receive as part of the compensation package under the SPA.  A true and accurate copy of the loan agreement is attached as Exhibit 3.

47.     On March 20, 2014, Track Group issued 84,078 of "Initial Buyer Shares" to Sabag. Approximately nine months later, Sabag tendered his "Initial Buyer Shares" to Sapinda in full repayment of its $1.6 million loan.

48.     The 152,391 shares of Restricted Stock that were issued to Sabag in the Acquisition could not be sold by Sabag under SEC rules for a period of two years from the closing date of the Acquisition.  As discussed above and further below, Sapinda agreed through a put option, to purchase the Restricted Stock after three years for $20 per share (or a little more than $3 million). Windhorst personally guaranteed the payment of the $20 per share under the put option.  A true and accurate copy of the Put Option Agreement and the personal guarantee is attached as Exhibit 4.

49.     With respect to the issuance of Contingent Stock in the Acquisition (if certain earn-out requirements were met), Section 2.10 of the SPA provides in relevant part:

> Buyer [Track Group] agrees to pay to Seller [Sabag] additional consideration for the Company Shares as follows:
> (a)     Common Stock equivalent to $1,000,000 divided by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US)  of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the date of issuance (the "First Contingent Stock") to be delivered to Seller within 30 days after the Company sells or leases (directly or

through the Buyer) a minimum of 1,500 GPS tracking devices for offenders under "revenue generating contract(s)" as defined below.

(b)      Common Stock equivalent to $2,000,000 divided by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US)  of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the date of issuance (the "Second Contingent Stock" and, together with the First Contingent Stock, referred to collectively herein as, the "Contingent Stock") within 30 days after the Company sells or leases (directly or through the Buyer) a minimum of 2,500 GPS tracking devices for offenders under "revenue generating contract(s)…

(e)      For avoidance of doubt, the Parties agree that the 2,500 additional GPS tracking devices referenced in this Section 2.10(b) shall not include any GPS tracking devices under Section 2.10(a), contracts executed within 36 months of the Closing Date for (a) the sale of GPS devices and collection of proceeds at a sale price reasonably acceptable to Buyer, or (b) the execution of a contract for the lease of GPS devices with at least twenty-four (24) months of recurring revenues at a lease rate reasonable acceptable to Buyer.

50.      Accordingly, a significant portion of the purchase price for Sabag's company, GPS Global, was to be paid through issuance of the Contingent Stock.

51.      Sabag was eligible to receive Contingent Stock if certain thresholds were met with regard to the sale or lease of GPS devices (1,500 and 2,500 amounts) and Track Group was required to use its best business efforts to enable him to do so.  Sapinda agreed through a put option to purchase the Contingent Stock issued to Sabag for $20 per share, and Windhorst personally guaranteed the put option.

52.      Section 10A.2(d) of the SPA required that "the parties agree to act in good faith to allow the Seller [Sabag] to reach his Contingent Stock milestones set forth in Section 2.10 as long as it does not prejudice the reasonable business interests of the Company as determined by the board of directors of the Company."

53.     The Contingent Stock milestones set forth in the SPA were easily achievable by Track Group, and the terms of the milestones were not set to allow Track Group, Sapinda, and Windhorst to profit from Sabag's technology while ignoring their covenant of good faith and fair dealings when conducting future "revenue generating deals" with third parties.

54.     On June 30, 2014, Track Group disclosed in its SEC filings that it expected Sabag to achieve the award of the Contingent Stock at issue, by stating that "[m]anagement determined that it was probable that sales of GPS Global devices would exceed the number of units specified in the SPA, and has therefore, recognized a Stock Payable liability for the entire $3,000,000 value of common shares payable."

55.     Track Group did not disclose in its SEC filings, however, that Track Group's largest shareholder had jointly agreed through a put option to purchase those Contingent Shares for $20 per share.

## Sapinda's Put Agreement and Windhorst's Guaranty

56.     As discussed above, as a result of Windhorst's claim that Track Group was unable or unwilling to purchase GPS Global for cash, Track Group, Sapinda, and Windhorst proposed an indirect method in which Track Group would purchase GPS Global mostly with Track Group stock, and Sapinda and Windhorst (through a so-called "loan," "put option," and guaranty agreement) would provide the financial backing to ensure that Sabag would receive, at a minimum, the total value of $8 million for the Acquisition.

57.     Concurrent with the negotiations leading to the SPA, and to induce Sabag's execution of the SPA, Windhorst, personally, and on behalf of Sapinda, a major controlling shareholder of Track Group, negotiated with Sabag and promised to acquire all of the shares that Sabag received from Track Group under the SPA for a minimum price.

12

58.     As discussed above, on or about March 16, 2014, and contemporaneous with the SPA, Sapinda entered into the Put Option Agreement under which Sapinda, as well as its sole shareholder, Windhorst (by personal guaranty), signed a Put Option Agreement promising to acquire Sabag's Restricted Shares and Contingent Stock in Track Group <u>three years after the Acquisition</u> for a Strike Price of $20.00 per share.[2]

59.     The purpose and intent of the Put Option Agreement was to ensure that Sabag would be positioned, in the event that the price of the shares in Track Group later declined, to receive the full value of the Acquisition.  Sabag could not sell his Restricted Stock for two years, and he may not receive the Contingent Stock for at least three years.  As such, the Put Option Agreement was a way to create a minimum floor price for the Acquisition under all circumstances.

### <u>Windhorst Realizes the Bad "Secret" Deal He Negotiated<br>As Well as His Enormous Potential Cost if Sabag Achieves His Earn-Out</u>

60.     After the Acquisition, the trading price of Track Group started to tumble in the open market.  As a result of this price decline, the provisions of the Put Option Agreement created large unexpected liabilities for Sapinda and Windhorst.  Track Group would be required, under the earn-out provisions of the SPA, to issue as much as $3 million of Track Group shares to Sabag <u>based on the current trading price of the shares</u>.  On the other hand, Sapinda was required to purchase all of those same shares (under the Put Option Agreement) after three years, regardless of the current trading price of those shares, for $20 per share.  At the time of the Acquisition, Track Group shares were trading at approximately $19 per share.  Today, the shares of Track Group trade at approximately one dollar per share ($1.00).

---

[2] On September 30, 2014, Track Group announced its rebranding and the use of its new trade name "Track Group".

61.     Thus, Windhorst was faced with the hypothetical scenario shortly after the Acquisition took place whereby Track Group's stock price could drop to $1 and Track Group would be required to issue 3 million shares to Sabag under the earn-out clause.  Sapinda and Windhorst would thereafter be liable under the Put Option Agreement to purchase those 3 million shares for $60 million (3 million x $20).  If the price of Track Group dropped to $0.10, Sapinda and Windhorst knew that they could be liable for $600 million to Sabag.  As stated above, Track Group's total revenues for 2013 were only approximately $15.6 million.  Once Windhorst had realized the bad deal that he had negotiated with Sabag, he had ample reason to never allow Sabag to achieve his earn-out shares from Track Group for fear of being personally liable for far more than his stake in Track Group was worth.

62.     At the time that the Put Option Agreement expired after three years, the shares of Track Group were actually selling for approximately $3.20.  Thus, Sapinda and Windhorst would have been required to pay $18.75 million for Sabag's Contingent Stock (when Track Group total annual revenues were about the same amount).

63.     It is reasonable to believe that based on the imminent staggering financial risk to Sapinda and Windhorst that Sapinda and Windhorst continued to secretly run Track Group (a publicly traded company) in the background and directed the activities that impact Sabag's earn-out rights.

### Track Group Does Not Make an SEC Disclosure of its Collaboration with Its Principal Shareholder and Lender

64.     Despite the obvious nature of the internal dealings and negotiations between Windhorst, Cohen, Sapinda, Dubois, and the legal obligations and gains afforded to them which were unknown to the public or other shareholders, Track Group did not issue an SEC disclosure or otherwise alert investors or its current shareholders of its collaborate activities with Sapinda and

14

Windhorst regarding the Acquisition.  As such, no shareholder of Track Group would have been made aware that Track Group's largest shareholder had already signed a contract to acquire the shares of Track Group that Sabag would receive from the Acquisition.

65.     Windhorst, Cohen, Sapinda, Dubois and Track Group were aware of the inappropriateness of this arrangement.  In one email, for example, Cohen admonished Sabag when he innocently copied Track Group's General Counsel on an email with some details of the Proposed Acquisition being handled by Sapinda.

## Windhorst's Control and Influence Over Track Group

66.     In April 2015, in the middle of the earn out period for the Contingent Stock, Track Group issued notice of the 2015 annual Meeting of Stockholders, which included a proxy statement to reduce the Board of Directors from six to four members, maintaining Dubois and David Boone and adding two newly nominated Directors by plurality vote.

67.     In September 2015, Track Group disclosed that Chairman Dubois, who was appointed to the Board of Directors as a condition of a 2012 loan from Sapinda, would continue in his role in carrying out chief executive functions alongside David Boone until the company appoints a new chief executive officer.

68.     Track Group's Board of Directors member Rene Klinkhammer, who was an employee of Sapinda from 2007 through July of 2013, completed a five-year Track Group Board membership that ended in May of 2015.  He was not reappointed to the Board.

69.     In May 2015, Track Group added Board Member Dirk Karel J. van Daele, to whom Track Group disclosed that Windhorst privately transferred 55,835 Track Group shares, a transaction that settled on July 7, 2015.

70.     According to SEC 10-k filed in September 2015, Dubois, Boone, and van Daele made up the entire Board of Directors of Track Group.  All of them were tied to Windhorst.

71.     As of September 25, 2015, Windhorst and Sapinda owned 50.9% of Track Group, according to Track Group's SEC Schedule 13D.

72.     As further proof of the demonstrable control Windhorst and Sapinda had over Track Group, it was required to advise its shareholders in its 2015 and 2016 annual SEC filings, in a section entitled "Risks Related to Our Common Stock" that,

> "[o]ur largest shareholder's beneficial ownership is over 50%, and is therefore able to exert control over us, which may limit your ability to influence corporate matters. Sapinda Asia Limited and Mr. Lars Windhorst (collectively "Sapinda Asia") beneficially own more than 50% of the outstanding voting securities of the Company.  As a result, Sapinda Asia will control the outcome of any shareholders' meeting for the foreseeable future, including having the power to determine the composition of our board of directors and control the outcome of the voting on any significant corporate transactions or other matters submitted to our shareholders for approval. The interests of Sapinda Asia may not be aligned with or be in the best interests of other shareholders. This concentration of voting power could also have the effect of delaying, deterring or preventing a change of control or other business combination that might otherwise be beneficial to other shareholders."

73.     Within eighteen months after the Acquisition, and prior to the issuance by Track Group of any Contingent Stock (that Sabag would have been able to sell to Sapinda/Windhorst for $20 per share), Windhorst had gained a "legal" controlling interest in Track Group, such that he exerted considerable dominant influence over the corporate transactions and management of the company, even as acknowledged by Track Group itself.

74.     With legal control over Track Group, Windhorst was positioned and empowered to exert the same influence that he used to cause Track Group to make the Acquisition to ensure that Track Group would never enter into any deals whereby Sabag could achieve his earnout (causing Sapinda and Windhorst to pay millions of dollars).

**Interference With Sabag's Control, Employment and Business Efforts
to Promote GPS Device Sales or Leases Qualifying for the Contingent Stock**

75.      A key part of Sabag's negotiations with Track Group was to have influence in the

company so he could meet the Contingent Stock thresholds.  Sabag required that he remain the

CEO for GPS Global and that he maintain a position with Track Group that would allow him to

promote and sell GPS devices.

76.      As a condition to the SPA, under Section 10A.2(c), Track Group agreed to employ

Sabag in the capacity of day-to-day management of his former company, unless and until

terminated.

77.      Track Group, Windhorst, Dubois, and Cohen agreed with Sabag's request, and

Sabag received an employment agreement with Track Group and became a Divisional President

International working out of North and South America.

78.      Very soon after the Acquisition, Track Group began interfering with and trimming

back Sabag's corporate involvement with Track Group.

79.      While employed with Track Group, Sabag presented business opportunities to Track

Group that were either not pursued or rejected.

80.      For example, Sabag presented opportunities for deals at the tender stage in Europe

and Latin America that only needed to be executed to count towards Sabag's earnout.  However, the

deals were either interfered with or unjustifiably abandoned or not closed.  Other opportunities

presented by Sabag, including the opportunity to close another deal in Central America, were

outright rejected without any explanation, oftentimes at the hand of Dubois.

81.      Additionally, upon information and belief, Sabag qualified for Contingent Stock by

virtue of executed and closed transactions with the Commonwealth of Virginia and Country of

Chile.  Notwithstanding, Track Group did not properly recognize those deals or pay Sabag the

17

earned Contingent Stock.  This is so even though Windhorst, Cohen and Dubois represented to

Sabag during negotiations before the Acquisition that he should have no worries about the earnout

milestones because he would hit the milestones with only the U.S. market included.

82.     Track Group closed its Chile deal before the Acquisition and entered into a very

unorthodox term of 41 months putting the possibility of any new contract with Chile just outside of

the period during which Sabag would otherwise qualify for his Contingent Stock.

83.     On or about October 1, 2015, Track Group abruptly removed Sabag from working

on various deals that Sabag was negotiating that would have counted towards his earnout milestone,

and he had no further control or visibility over securing contracts that would to qualify him to

receive Contingent Stock.

84.     At this same time, Dubois, on behalf of Track Group, also removed Sabag from

responsibilities Sabag was handling for "Rest of World" sales which was transferred to John

Kirtland.

85.     Realizing that Track Group was now openly blocking Sabag's efforts to sell or lease

GPS Devices, Sabag wrote to Dubois on October 13, 2015 that "[u]nder these circumstances, I

cannot protect my earn-out and make sure I meet my goals and receive my additional

compensation. This compensation was the reason I sold my company to begin with. I need some

assurance that your guys – which I don't trust – will make those sales. I have no intention to lose my

earn-out due to their performance, and I personally don't think that it is neither fair, nor in-line with

our agreement."

86.     In November 2015, Track Group shut down the operations of Sabag's company in

Israel, and it moved manufacturing of the Shadow (Sabag's product), to China.  Track Group also

re-assigned Sabag's sales territory to others, and on April 1, 2016, Track Group terminated Sabag's employment agreement, without cause.

## Sabag's Demand For Contingent Stock And Exercise Of Put Option

87.     On March 28, 2017, nearing the end of the earnout period, counsel for Sabag sent a letter to Track Group's General Counsel, Gordon Jesperson, urging Track Group to act without delay in delivering the Contingent Stock, as granted by the SPA, as not to impede Sabag in his intent to exercise his related put option under the Put Option Agreement.

88.     Track Group responded to Sabag by letter dated March 30, 2017 stating that Sabag did not meet any of the earn-out milestones to qualify for the payment of the Contingent Stock.  In the letter, Track Group did not provide any raw sales data or contracts demonstrating the sales or leases of GPS devices to Sabag for his review and analysis with respect to the Contingent Stock.

89.     Further, although Sabag has reason to believe he qualified for the Contingent Stock, Track Group refused to issue the Contingent Stock.

90.     On March 29, 2017, Sabag delivered a notice to Sapinda and Windhorst, to exercise the put option under the Put Option Agreement for all of the 152,391 shares of Restricted Stock (152,391 x $20 = $3,047,820).  Sabag separately reserved his rights to tender the Contingent Stock to Sapinda and Windhorst at a later time, which Sabag believed that Sapinda and Windhorst had ordered Track Group to withhold.

91.     Despite providing proper notice on March 29, 2017, Sapinda and Windhorst refused to honor their obligations under the Put Option Agreement to pay Sabag the $3.047 million they owed for the 152,391 shares of Restricted Stock at $20 a share.  Of course, Sapinda and Windhorst did not acknowledge the Contingent Stock.

92.     As a result of Sapinda's and Windhorst's refusal to honor any aspect of the Put Option Agreement, Sabag was forced to initiate insolvency proceedings against Sapinda in the British Virgin Islands to enforce the agreement.  At that time, Sapinda was attempting to transfer its entire interest in its Track Group shares to a third party, leaving Sapinda with no assets to pay Sabag.  Sapinda and Windhorst ultimately settled the matter a few days before the first insolvency hearing was held by paying Sabag $3.047 million that he was owed for his 152,391 shares Restricted Stock under the Put Option Agreement.  The settlement agreement explicitly stated that it did not resolve the issue of the Contingent Stock.

93.     Upon information and belief, and given the demonstrated past history of hidden collaborative efforts and backroom financing arrangements, Track Group, in conjunction with, or at the direction, control or influence of and definitely for the benefit of Windhorst and Sapinda, manipulated the circumstances surrounding its contract options for sales or leases of GPS devices in an attempt to reduce the number of sale or lease agreements that would apply toward the Contingent Stock metrics.

94.     Upon information and belief, Track Group has entered into multiple contracts that utilize Sabag's intellectual property in the sale or lease of Sabag's product.  There is little controversy over whether those contacts involved enough sales or leases of Sabag's product to qualify Sabag to receive $3 million in Contingent Stock from Track Group.  Track Group's public filings confirm the nature of its contracts and the quantities of products that it has sold or leased. Sabag alleges that the terms of various contracts for Sabag's products were manipulated in bad faith by Track Group, Sapinda, and Windhorst (and other contract negotiations were abandoned) so that Track Group could claim that Sabag never met his earnout milestones.

## V.      CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT AGAINST ALL DEFENDANTS

95.     Sabag hereby incorporates by reference the allegations set forth in paragraphs 1 through 94 as if fully set forth herein.

96.     The SPA constitutes a valid and enforceable contract between Track Group and Sabag, and alternatively, also with Windhorst and Sapinda as joint venture partners.

97.     Track Group breached the SPA by, among other things, not fulfilling its obligations to act in good faith and deal fairly with respect to the Contingent Stock awards, not issuing Contingent Stock to Sabag after he qualified for it, not providing Sabag with an accounting of the sales and leases of GPS Devices, and deliberately and purposefully structuring, manipulating, rejecting and avoiding contractual opportunities for the sale or lease of GPS Devices that Track Group believed would have otherwise qualified Sabag for the issuance of Contingent Stock to evade the consequence and outcome of Section 2.10 of the SPA and obligations of Sapinda and Windhorst under the Put Option Agreement.

98.     For instance, and not to the exclusion of other examples, Track Group was positioned to enter into an agreement with Marion County Community Corrections in a way that would have qualified Sabag to receive the Contingent Stock.  Track Group, however, breached its duty of good faith it owed to Sabag with respect to its dealings and negotiations as to the length of the term of the agreement(s) with Marion County Community Corrections by failing to negotiate the deal so that Sabag qualified for the Contingent Stock.  In fact, after the original terms of the deal with Marion County Community Corrections were negotiated, the original 24-month term of the deal for the lease of Sabag's GPS devices suddenly became 18 months.

21

99.    Also, Sabag believes that he qualified for the issuance of the Contingent Stock because the contracts entered into by Track Group during the relevant period led to and produced twenty-four months of "recurring revenue" that was uninterrupted. Indeed, the initial lease contract in 2016 with Marion County Community Corrections produced the opportunity of recurring revenue totaling more than twenty-four months as it led to what was merely an extension of the prior relationship and "recurring revenue" for twenty-four months or more.

100.    Also, Sabag was either removed from the ability to make sales or leases of GPS Devices, or the business opportunities that he presented were not followed up by Track Group (or delayed) in an effort to deny him the Contingent Stock.

101.    By way of another example of Track Group's violation of the SPA, it undertook substantial efforts to interfere with and deny Sabag the opportunity to have control over the volume of GPS Device sales/leases, including eventually terminating his employment prematurely, without cause; despite Defendants' promises and representations that Sabag would be able to control and manage sales as a way to ensure he received his earn-out.

102.    Remarkably, soon after the third anniversary of the SPA which is when Track Group believes to be the last point of Sabag being able to qualify for Contingent Stock (which Sabag does not concede to be what the contract requires), Track Group entered into multiple deals that would have qualified Sabag for Contingent Stock.

103.    Sapinda, solely owned and controlled by Windhorst, was the controlling shareholder of Track Group during the period in which Sabag was attempting to achieve the earnout milestones. If Track Group had awarded Sabag the $3 million in Contingent Stock on the last day of the earn-out period, Sapinda and Windhorst by personal guaranty, would have been required to pay $18.75 million to purchase that Contingent Stock.

22

104.    Upon information and belief, Windhorst was in a position to exert influence and control over Track Group during this time, and he had a strong economic incentive to ensure that Sabag was never issued the Contingent Stock, despite Track Group previously representing in its SEC filings that it fully expected to pay the Contingent Stock.

105.    Neither Track Group nor Windhorst, personally or as an agent of Sapinda, upheld or fulfilled their duties under the SPA.

106.    Neither Windhorst nor Sapinda, upheld or fulfilled their duties under the Put Option Agreement.

107.    Windhorst, Cohen, Dubois, Sapinda and Track Group acted as co-joint venturers when they negotiated and finalized the Acquisition. Sapinda and Windhorst effectively controlled Track Group at all times while they were negotiating for the Acquisition. Sapinda, Windhorst, and Track Group stood to share in the profits of a successful acquisition of Sabag's company, as the Acquisition was intended to increase the value of the Track Group shares through new business opportunities.

108.    As a direct and proximate result of Track Group's breach of the SPA and the breaches of the Put Option Agreement, Sabag has been unable to recover the value upon which he relied when he sold his company to Track Group.

109.    Sabag has suffered and continues to suffer damages as a result of the breach of these two contracts.

WHEREFORE, Plaintiff Sabag respectfully requests the Court to enter a judgment in Sabag's favor and against Track Group, Sapinda, and Windhorst, to award compensatory, special, general and punitive damages, disgorgement of gains, restitution, costs of this action, attorney's fees, pre- and post-judgment interest, and all other relief that is just and proper in the premises.

## COUNT II
## BREACH OF FIDUCIARY DUTY AND DUTY OF
## GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

110.     Sabag hereby incorporates the allegations set forth in paragraphs 1 through 109 as if fully set forth herein.

111.     Track Group, Sapinda, and Windhorst owed Sabag a duty of good faith and fair dealing in the negotiation and execution of the SPA, and Track Group had an express duty of good faith to allow Sabag to reach his Contingent Stock milestones per Section 10A.2(d) of the SPA.

112.     Sapinda and Windhorst owed Sabag a duty of good faith and fair dealing under the Put Option Agreement.

113.     Track Group, controlled and aided by Windhorst and Sapinda, breached that duty of good faith and fair dealing by violating the clear intent of the SPA and thereby denying Sabag the right to the promised and expected compensation under the contracts.

114.     The Defendants' deliberate manipulation to avoid sales/leases they believed to qualify as "revenue generating," or make representations or deals to make it appear that way, and thereby dodging the award of millions of dollars in shares of Contingent Stock, demonstrates that they acted without the requisite good faith.

115.     Track Group knew the award of Contingent Stock would have had (1) a dilutive effect on the executives and Board members who were highly compensated by stock awards and (2) a devastating financial cost to the company's biggest shareholder and largest lender.  Track Group also knew that, in certain cases, the revenue that it could generate from certain contracts (that would qualify Sabag for his Contingent Stock) may be significantly less than the financial amounts that Sapinda and Windhorst would be required to pay Sabag under the Put Option Agreement for the Contingent Stock.

116.   With that knowledge, and acting in bad faith, Track Group manipulated the circumstances surrounding business transactions and activities in what is believed to be designed as a way to purposefully avoid meeting sales or lease milestones during the time when Sabag would qualify for the Contingent Stock.

117.   Then, after the passage of what Track Group believed to be the end period for Sabag to qualify for Contingent Stock, Track Group remarkably was able to extend existing deals producing qualifying contract terms or to enter into new deals with the same old customers with duration terms similar to the contract lengths and terms that would have qualified under the Contingent Stock award.

118.   Track Group also failed to disclose all of the data, information and contracts that would allow Sabag to evaluate whether he did, in fact, qualify for the Contingent Stock, and this too was a breach of good faith.

119.   Moreover, there is at least one known example in Marion County, Indiana, and likely more, where Track Group could have negotiated a slightly different term of the agreement (e.g., 6 month longer term in the case of Marion County) to place Sabag in the position of qualifying for his earnout milestone, but Track Group breached its duty by not pursuing that term which would have allowed Sabag to qualify to meet his earnout milestone.

120.   Additionally, there are other cases where Track Group narrowly read the earnout terms of the SPA to exclude existing sales or leases of GPS devices from qualifying for the earnout milestones.  This is another instance of Track Group acting in bad faith.

121.   Sapinda and Windhorst owed Sabag a duty of good faith and fair dealing in the performance of the Put Option Agreement that was negotiated concurrently with the SPA as a significant inducement to Sabag, who relied upon the bargained benefit.

122.    With deliberation and intentional determination, upon information and belief, Windhorst exerted the influence by virtue of his controlling interest in Track Group to negatively impact the rights that Sabag was contractually entitled to under the SPA and Put Option Agreement, as the exercise of this stock option by Sabag would have created a significant material loss to Windhorst.

123.    As a direct result of the breaches of the covenant of good faith and fair dealings under the SPA by Track Group, Sapinda, and Windhorst (and the Put Option Agreement by Sapinda and Windhorst), Sabag has suffered and continues to suffer damages.

WHEREFORE Plaintiff Sabag respectfully requests the Court to enter a judgment in Sabag's favor and against Defendants Track Group, Sapinda, and Windhorst, to award compensatory, special, general and punitive damages, disgorgement of gains, restitution, costs of this action, pre- and post-judgment interest, and all other relief that is just and proper in the premises.

### COUNT III
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
### AS TO DEFENDANTS SAPINDA AND WINDHORST

124.    Sabag hereby incorporates the allegations set forth in paragraphs 1 through 123 as if fully set forth herein.

125.    To the extent that Defendants argue that they did not operate as a legal joint venture when they jointly negotiated the SPA with Sabag (each contributing their own financial consideration with the goal of generating a profit), then Sabag states in the alternative that Sapinda and Windhorst interfered with the SPA between Sabag and Track Group.

126.    A valid and enforceable contract exists between Sabag and Track Group, namely the SPA.

127.    Defendants Sapinda and Windhorst were aware of the SPA, as they explicitly referred to it in the Put Option Agreement that Windhorst negotiated on behalf of Sapinda and personally guaranteed.

128.    Based on information and belief, Sapinda and Windhorst intentionally interfered with and caused Track Group to breach its contractual relationship with Sabag, for the purpose of protecting themselves from a substantial financial loss under the Put Option Agreement.

129.    Sapinda and Windhorst had no lawful or legitimate purpose for interfering with the SPA between Track Group and Sabag and their interference was otherwise absent of justification.

130.    Track Group breached the SPA, through its failure to issue the Contingent Stock, and Sabag did not receive any Contingent Stock.

131.    As a result of Defendants Windhorst's and Sapinda's interference with the valid contract between Sabag and Track Group, and Track Group's subsequent breach, Sabag has suffered and continues to suffer significant damages.

WHEREFORE, Plaintiff Sabag respectfully requests the Court to enter a judgment in Sabag's favor and against Defendants Track Group, Sapinda, and Windhorst, to award compensatory, special, general and punitive damages, disgorgement of gains, restitution, costs of this action, pre- and post-judgment interest, and all other relief that is just and proper in the premises.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS
## AS TO DEFENDANT TRACK GROUP

132.    Sabag hereby incorporates the allegations set forth in paragraphs 1 through 131 as if fully set forth herein.

133.    To the extent that Defendants argue that they did not operate as a legal joint venture when they jointly negotiated the SPA with Sabag (each contributing their own financial consideration with the goal of generating a profit), then Sabag states in the alternative that Track Group interfered with the Put Option Agreement between Sabag and Sapinda.

134.    A valid and enforceable contract exists between Sabag and Sapinda, namely the Put Option Agreement (personally guaranteed by Windhorst).

135.    Defendant Track Group participated in the negotiation of the Put Option Agreement, as Dubois was part of the "group" negotiations in which the Put Option Agreement, Windhorst's $1.6 million loan, and the personal guaranty of Windhorst became a material part of the Acquisition.

136.    Based on information and belief, Track Group intentionally interfered with and caused Sapinda and Windhorst to breach their contractual relationship with Sabag, for the purpose of protecting Track Group, as well as its majority shareholder and lender, from the substantial financial loss associated with the monetary obligations owed to Sabag under the Put Option Agreement.

137.    Track Group also interfered with Sabag's contractual rights under the Put Option Agreement by willfully failing to issue Contingent Stock, manipulating sales and leases of tracking devices to deny Contingent Stock or not accurately accounting to Sabag with the accurate number of tracking devices sold or leased.

138.    Track Group had no lawful or legitimate purpose for interfering with the Put Option Agreement between Sapinda, Windhorst and Sabag and its interference was otherwise absent of justification.

139.     Sapinda and Windhorst did not fulfill their obligations to Sabag as a result of Track Group's deliberate acts which interfered with the Put Option Agreement.

140.     As a result of Defendant Track Group's interference with the valid contract between Sabag and Sapinda and Windhorst, and Sapinda and Windhorst's subsequent breach, Sabag has suffered and continues to suffer significant damages.

WHEREFORE, Plaintiff Sabag respectfully requests the Court to enter a judgment in Sabag's favor and against Defendants Track Group, Sapinda, and Windhorst, to award compensatory, special, general and punitive damages, disgorgement of gains, restitution, costs of this action, pre- and post-judgment interest, and all other relief that is just and proper in the premises.

## COUNT V
## UNJUST ENRICHMENT
## AS TO DEFENDANTS SAPINDA AND WINDHORST

141.     Sabag hereby incorporates the allegations set forth in paragraphs 1 through 140 as if fully set forth herein.

142.     The SPA and the Put Option Agreement were negotiated in tandem to induce Sabag to sell his company.

143.     Sapinda and Windhorst successfully induced Sabag to sell his company, in reliance upon the promises and representations made by Cohen and Windhorst surrounding the transaction.

144.     As a result of Sabag's sale, based on information and belief, Sapinda/Windhorst subsequently used their position of controlling shareholder to deny Sabag the Contingent Stock he would have earned and upon which he would have received the benefit of the put option under the Put Option Agreement from Windhorst.

145.     As a result of the improper conduct of Defendants, Track Group acquired the intellectual property from Sabag's company without paying Sabag the full value for that intellectual property.  Track Group continues to profit today by offering Sabag's intellectual property to new customers, and Sabag was never fully compensated by Track Group from its old and new profits that arose solely from the Acquisition.  It would be unjust for Track Group to retain the benefits it received without restitution to Sabag for his losses.

146.     As a result of the improper conduct of Sapinda/Windhorst, Sapinda/Windhorst were unjustly enriched with a stronger controlling interest in Track Group because Track Group did not issue the Contingent Stock to Sabag.

147.     Additionally, Sapinda/Windhorst were unjustly enriched by retaining the money Sabag was entitled to be paid through the exercise of the put option under the Put Option Agreement that Sapinda/Windhorst prevented him from receiving.

148.     Accordingly, Sapinda/Windhorst received a measurable benefit at their express or implied request for which Sabag expected to receive payment, specifically the Contingent Stock, and it would be unjust for Sapinda/Windhorst to retain the benefits they received as a result without restitution to Sabag for his losses.

WHEREFORE, Plaintiff Sabag respectfully requests the Court to enter a judgment in Sabag's favor and against Defendants, to award compensatory, special, general and punitive damages, disgorgement of gains, restitution, costs of this action, pre- and post-judgment interest, and all other relief that is just and proper in the premises.

## COUNT VI
## ACCOUNTING – AS TO DEFENDANT TRACK GROUP

149.     Sabag hereby incorporates the allegations set forth in paragraphs 1 through 148 as if fully set forth herein.

30

150.    Sabag was entitled to receive Contingent Stock under Section 2.10 of the SPA upon the satisfaction of certain conditions.

151.    It is reasonably believed that Sabag either qualified for the Contingent Stock or Defendants improperly and unlawfully interfered with his right to qualify for the Contingent Stock.

152.    Track Group has refused to issue Sabag the Contingent Stock.

153.    Track Group has not voluntarily provided an accounting and the supporting documentation, data and contracts of all sales and leases that may possibly be considered under Section 2.10 of the SPA to Sabag in order for him to confirm, evaluate and verify the total amount due to him.

154.    Track Group is in sole custody and possession of the records necessary to undertake the analysis and calculate the amount due under Section 2.10 of the SPA.

155.    Consequently, Sabag requests a full and complete accounting by Track Group of all the information and data related to its sales and leases of all GPS Devices as it may concern the Contingent Stock conditions under Section 2.10 of the SPA.

WHEREFORE, Plaintiff Sabag respectfully requests that this Court enter Judgment in his favor and against Defendant, Track Group, order Defendant Track Group to provide a full and complete accounting of all information and data relating to its sales and leases of GPS devices, and for all other just and proper relief.

## COUNT VII
## CLAIM FOR DECLARATORY JUDGMENT AS TO ALL DEFENDANTS

156.    Sabag hereby incorporates the allegations set forth in paragraphs 1 through 155 as if fully set forth herein.

157.    Sabag has an interest under a written contract or other writings constituting a contract, specifically, the SPA, Put Option Agreement and Windhorst's personal guaranty.

31

158. A disagreement has arisen as to Sabag's rights, status and legal relations under the SPA, Put Option Agreement and personal guaranty.

159. Pursuant to Indiana Code § 34-14-1-1 *et seq*. of the Indiana Uniform Declaratory Judgment Act ("Indiana DJA"), Sabag seeks a declaration of his rights, status, and other legal obligations relating to, among other items, the Contingent Stock provisions and awards under the SPA and Put Option Agreement and his rights under the Guaranty.

160. Pursuant to Indiana Trial Rule 57, Sabag brings this action to request a declaratory judgment from the Court declaring his rights, status and other legal entitlements under the SPA, Put Option Agreement, and Guaranty and for enforcement of those rights, status and other legal entitlements.

161. Sabag also seeks an award of his costs and fees pursuant to Indiana Code § 34-14-1-10 of the Indiana DJA which provides that the court may make an award of costs as may seem equitable and just.

WHEREFORE, Plaintiff Sabag respectfully requests that this Court enter Judgment in his favor and against Defendants, and to declare Sabag's rights, status, legal obligations and entitlements under the SPA, Put Option Agreement and Windhort's personal guaranty, and for all other just and proper relief.

Respectfully submitted,

Date: <u>May 4, 2018</u>

<u>/s/ Offer Korin</u>
Offer Korin, Atty. No. 14014-49
Kristopher N. Kazmierczak, Atty. No. 19430-49
KATZ KORIN CUNNINGHAM PC
334 N. Senate Avenue
Indianapolis, IN 46204
Office (317) 464-1100
Fax (317) 464-1111
Email:  okorin@kkclegal.com
          kkaz@kkclegal.com

*Attorneys for Plaintiff Eli Sabag*

Case 1:18-cv-02208-TWP-TAB   Document 1-5   Filed 07/18/18   Page 34 of 97 PageID #: 70

Filed: 5/4/2018 5:30 PM
Myla A. Eldridge
Clerk
Marion County, Indiana

Marion Superior Court, Civil Division 14



11 March 2014


Mr Eli Sabag
Maapilim 14
Kfar Saba
Israel


Dear Sir,

**Assets and Cash Position – Proof of Funds**

I confirm that Shard Capital Partners LLP currently holds marketable assets and cash for Sapinda Holding BV, Sapinda Asia BVI Limited and other Sapinda Group companies to a total value of well in excess of USD 150 million.

All securities are held in client money accounts segregated from Shard's own assets at Global Prime Partners Limited with Deutsche Bank AG and KAS Bank NV, who are their sub custodians.


Yours sincerely

NW E Lewis
Managing Partner

**Shard Capital Partners LLP**
1 Tudor Street
London
EC4Y 0AH

phone +44 (0)20 34 63 49 90
fax +44 (0)20 34 63 49 91
email info@shardcapital.com
www.shardcapital.com

Authorised and regulated by the Financial Services Authority

Registered Partnership number OC360394

EXHIBIT 1

Case 1:18-cv-02208-TWP-TAB    Document 1-1    Filed 06/14/18    Page 35 of 97 PageID #: 41

Marion Superior Court, Civil Division 14

Filed: 5/4/2018 5:30 PM
Myla A. Eldridge
Clerk
Marion County, Indiana

# CLOSING PROTOCOL

March 31, 2014

(the "**Protocol**")

Reference is made to that Share Purchase Agreement (the "SPA") dated as of March 12, 2014, by and among SECUREALERT, INC., a Utah corporation U.S.A. ("Buyer"), ELI SABAG, an individual resident of the State of Israel ("Seller"), and GPS GLOBAL TRACKING AND SURVEILLANCE SYSTEM LTD, an Israeli corporation (the "Company").

The parties hereby agree that this Protocol shall evidence, in connection with the Closing, the agreements of the parties as follows:

1.  **General**

    This Protocol is an integral part of the SPA, and in the event of any conflict between the provisions of the SPA and this Protocol, the provisions of this Protocol shall prevail and bind the parties.

    All capitalized terms not expressly defined herein shall have the meaning ascribed to them in the SPA.

2.  **Addendum to the SPA**

    New definition shall be added to Section 1 of the SPA as follows:

    > "Shareholder Loans" – *the shareholder loans provided by the Seller to the Company in the aggregate principal amount of NIS 6,901,293.17.*

    Section 2.3 of the SPA shall be deleted in its entirety and replaced with the following:

    > *2.3    CONSIDERATION AND LOAN REPAYMENT*
    >
    > *In consideration for the Company Shares and the Shareholders Loans , and subject to the terms and conditions herein, Buyer will pay Seller an aggregate amount of seven million eight hundred and eleven thousand four hundred and four US Dollars ($7,811,404) (the "Purchase Price"), payable as follows:*
    >
    > *(a) Cash Purchase Price. On the Closing Date, Buyer will pay to Seller by wire transfer in immediately available funds an amount equal to $311,404 (the "Cash Purchase Price").*
    >
    > *(b) Stock Purchase Price. The remaining Seven Million Five Hundred Thousand Dollars ($7,500,000) (the "Stock Purchase Price") will be paid in shares of $0.0001 par value common stock of Buyer (the "Common Stock"), as follows:*
    >
    > *(i)    On the Closing Date the Buyer shall deliver to the Seller a number of shares of Common Stock (the "Initial Buyer Shares") determined by dividing $1,600,000 by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US) of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the Closing Date (the "Transaction Share Price"). The Initial Buyer*

EXHIBIT 2          1_1068916



- 2 -

*Shares, when delivered to Seller, shall be free and clear from any Encumbrance other than the fact that they are not registered for trading under applicable United States securities law.*

*(ii)    On the Closing Date, the Buyer shall deliver to Zions Bank Corporation, a national banking association (the "Escrow Agent") a number of shares of Common Stock equal to $2,900,000 divided by the Transaction Share Price (the "Restricted Stock") to be held and released by Escrow Agent as provided in the Escrow Agreement in the form attached hereto as Schedule 2.9(a)(viii) ("Escrow Agreement") and subject to the terms and conditions set forth in Section 2.9(b)(v).*

*(iii)    In addition, Buyer shall issue the Contingent Stock in an amount equal to $3,000,000 divided by the Transaction Share Price as provided and subject to the conditions set forth in Section 2.10.*

*(c) Related Parties Loan Repayment. On the Closing Date, Buyer will provide the Company with $188,596 (the "Loan Repayment Amount"), by wire transfer in immediately available funds, in addition to any obligation of the Buyer under the Loan and Funding Agreement, and such amount shall be immediately transferred by the Company to LineBit Systems Ltd. ($172,544) and Eytanim Building and Infrastructure Ltd. ($16,052), as repayment of loans provided to the Company by such entities, which are controlled by the Seller.*

*(d) On the Closing Date, Buyer will extend the NIS 2,000,000 loan provided to the Company in accordance with the Loan and Funding Agreement.*

New Section 2.9(e) shall be added as follows:

*(e) Seller shall transfer and assign to the Buyer the Shareholder Loans.*

For the removal of any doubt, it is hereby clarified that the Shareholder Loans, shall not be repaid or extinguished prior to the Closing Date, and any required disclosure under the SPA, including, without limitation, under Section 3 of the SPA, is hereby made.

3.    **Closing Date**

The effective time of the Closing is April 1, 2014 (the "**Closing Date**").

4.    **Closing Deliverables**

(a) Seller's Deliverables.

(i)    A share transfer deed effecting the transfer of the Company Shares to Buyer executed by the Seller, is attached hereto as Schedule 2.9(a)(i);

(ii)    A Share Certificate representing the Company Shares, is attached hereto as Schedule 2.9(a)(ii);

(iii)    A Notice to the Israeli Registrar of Companies executed by the Company notifying the registrar of the transfer of the Company Shares to Buyer, is attached hereto as Schedule 2.9(a)(iii);

(iv)    A resolution of the Board of Directors of the Company is attached hereto as Schedule 2.9(a)(iv);

(v)    A resolution of the sole shareholder of the Company is attached hereto as Schedule 2.9(a)(v);

(vi)    Employment agreement with the Seller is attached hereto as Schedule 2.9(a)(vii)A;

- 3 -

(vii)   The Escrow Agreement executed by the Seller, is attached hereto as <u>Schedule 2.9(a)(viii)</u>.

<u>(b) Buyer's Deliverables.</u>
(i)   The Cash Purchase Price is hereby paid to the Seller by way of set-off of the Loan provided by the Buyer to the Seller, pursuant to that certain Loan Agreement between the Buyer and the Seller dated as of March 12, 2014. It is hereby agreed and acknowledged that such Loan and any interest accrued with respect the Loan shall be deemed fully repaid, and the Loan Agreement hereby becomes null and void;

(ii)   A copy of the certificate for the Initial Buyer Shares is attached hereto as <u>Schedule 2.9(b)(iii)</u>. It is hereby clarified that the number of the Initial Buyer Shares has been calculated as set forth in <u>Schedule A</u> attached hereto;

(iii)   A copy of the certificates for the Restricted Stock delivered by the Buyer to the Escrow Agent is attached as <u>Schedule 2.9(b)(v)(a)</u>. It is hereby clarified that the number of the Restricted Stock has been calculated as set forth in <u>Schedule A</u> attached hereto;

(iv)   A copy of the Escrow Agreement executed by Buyer is attached hereto as <u>Schedule 2.9(a)(viii)</u>;

(v)   A loan and funding agreement is attached hereto as Schedule 2.9(b)(viii).

(vi)   The Loan Repayment Amount, as defined in the SPA, is hereby paid by way of set-off from the Additional Loan, as such term is defined in that Loan and Funding Agreement by and between the Buyer and the Company, dated as of March 12, 2014. Buyer hereby extends the NIS 2,000,000 loan provided to the Company in accordance with the Loan and Funding Agreement. The Seller is hereby released from any obligation the Seller may have had under the Loan and Funding Agreement.

(vii)   A copy of a resolution of the Board of Directors of Buyer is attached hereto as <u>Schedule 4(b)(vii)</u>.

5.   **Payment Evidence**

Copies of the wire transfer confirmations are attached hereto as <u>Schedule A</u> attached hereto.

6.   **Miscellaneous**

6.1.   The SPA and this Protocol shall be read together and shall have the same effect as if the provisions of the SPA and this Protocol were contained in one agreement. Any provision of the SPA not amended expressly by this Protocol shall remain in full force and effect as provided in the SPA immediately prior to the date hereof.

6.2.   The governing law and jurisdiction of this Protocol shall be the same as the ones set forth in the SPA.

*-Reminder of page intentionally left blank-*

*-Signature page to follow-*

1_1068916

- 4 -

**IN WITNESS WHEREOF,** the parties hereto have executed this Protocol as of the date set forth above.

BUYER

SELLER

SECUREALERT, INC.

By:_____
    Guy Dubois, Chairman

_____

THE COMPANY

GPS GLOBAL TRACKING AND SURVEILLANCE SYSTEM LTD.

By:_____
    Eli Sabag, Director

G.P.S GLOBAL
איתור ועיקוב בע"מ
מספר ח.פ. 514168558
יד חרוצים 4 א.ת כפר-סבא ת.ד. 7011

1_1068916

## SHARE PURCHASE AGREEMENT

This Share Purchase Agreement ("Agreement") is made as of March 12, 2014, by and among SECUREALERT, INC., a Utah corporation U.S.A. ("Buyer"), ELI SABAG, an individual resident of the State of Israel ("Seller"), and GPS GLOBAL TRACKING AND SURVEILLANCE SYSTEM LTD, an Israeli corporation (the "Company").

## RECITALS

WHEREAS, Seller owns all of the issued and outstanding ordinary shares of the Company (the "Company Shares"); and

WHEREAS, subject to the terms and conditions of this Agreement, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, all of the Company Shares; and

WHEREAS, a significant part of the Purchase Price payable to the Seller shall be paid in Common Stock of the Buyer, and part of the Purchase Price shall be contingent upon certain milestones of the Company; and

WHEREAS, following the contemplated transaction, Seller shall serve as the CEO of the Company; and

WHEREAS, Buyer has agreed to provide the Company funding in accordance with the Loan and Funding Agreement (as defined below);

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, intending to be legally bound, the parties agree as follows:

## AGREEMENT

1.    **DEFINITIONS**

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.

*"Applicable Contract"* – any Contract (a) under which the Company has or may have acquired rights, (b) under which the Company has or may become subject to any obligation or liability, or (c) by which the Company or any of the assets owned or used by it is or may become bound.

*"Balance Sheet"* – as defined in Section 3.4.

*"Best Efforts"* – the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved expeditiously.

"*Breach* – a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision.

"*Business Day*" – means any 24-hour day other than a Friday, Saturday, Sunday or federal or state legal holiday on which commercial banks in the State of Utah, U.S.A. and Israel are open for the transaction of commercial banking business.

"*Buyer*" – as defined in the preamble of this Agreement.

"*Closing*" – as defined in <u>Section 2.4</u>.

"*Closing Date* " – as defined in <u>Section 2.4</u>.

"*Company*" – as defined in the preamble of this Agreement and each Subsidiary of the Company.

"Company *Shares*" – as defined in the recitals of this Agreement.

"*Contemplated Transactions*" – all of the transactions contemplated by this Agreement, including:

      (a)      the sale of the Company Shares by Seller to Buyer;

      (b)      the execution, delivery, and performance of the Employment Agreement, the First Contingent Stock and the Second Contingent Stock and the Escrow Agreement;

      (c)      the performance by Buyer and Seller of their respective covenants and obligations under this Agreement; and

      (d)      Buyer's acquisition and ownership of the Company Shares and exercise of control over the Company.

      (e)      Payment of the Purchase Price by Buyer to Seller.

      (f)      the Seller's Employment Agreement.

      (g)      the Loan and Funding Agreement.

"*Contract*" – any written agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding.

"*Dollars* " and "*$*" – shall mean United States dollars.

"*Damages*" – as defined in <u>Section 10.2</u>.

"*Disclosure Letter*" – the disclosure letter delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"*Exchange Act*" – means the United States Securities Exchange Act of 1934, as amended, and the Rules and Regulations promulgated thereunder.

"*Employment Agreement*" – as defined in <u>Section 2.9(a)</u>.

"*Encumbrance*" – any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of another attribute of ownership.

"*Environment*" – soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), groundwaters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

"*Environmental Law*" – any Legal Requirement that requires or relates to:

(a)     advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)     preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(c)     reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(d)     assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)     protecting resources, species, or ecological amenities;

(f)     reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(g)     cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(h)     making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

*"Escrow Agreement"* – as defined in <u>Section 2.3</u>.

*"Facilities"* – any real property, leaseholds, or other interests currently or formerly owned or operated by the Company and any buildings, plants, structures, or equipment (including motor vehicles) currently or formerly owned or operated by the Company.

*"GAAP"* – generally accepted Israeli accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and other financial statements referred to in <u>Section 3.4</u> were prepared.

*"Governmental Authorization"* – any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Government Body or pursuant to any Legal Requirement.

*"Governmental Body"* – any:

(a)     nation, state, county, city, town, village, district, or other jurisdiction of any nature;

(b)     federal, state, local, municipal, foreign, or other government;

(c)     governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)     body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

*"Knowledge"* – an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

(a)     Such individual is actually aware of such fact or other matter; or

(b)     A reasonable individual could be expected to discover or otherwise become aware of such fact or other matter.

(c)     A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has Knowledge of such fact or other matter.

*"Legal Requirement"* – any applicable federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

*"Loan and Funding Agreement"* - as defined in Section 2.9(b).

*"Order"* – any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made or rendered by any court, administrative agency, or other Governmental body or any arbitrator.

*"Ordinary Course of Business"* – an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

     (a)     Such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person;

     (b)     Such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority); or

     (c)     Such action is similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors (or by any Person or group of Persons exercising similar authority), in the ordinary course of normal day-to-day operations of other Persons that are in the same line of business as such Person.

*"Organizational Documents"* – (a) the articles or certificate of incorporation and the bylaws of a corporation or the certificate of incorporation, memorandum of association and articles of association in the case of an Israeli company; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (e) any amendment to any of the foregoing.

*"Person"* – any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

*"Proceeding"* – any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, otherwise involving any Governmental Body or arbitrator.

*"Related Person"* – with respect to a particular individual:

     (a)     each member of such individual's Family;

(b)     any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)     any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)     any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)     any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)     any Person that holds a Material Interest in such specified Person;

(c)     each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(d)     any Person in which such specified Person holds a Material Interest;

(e)     any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)     any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse and former spouses, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Exchange Act) of voting securities or other voting interests representing at least 5% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 5% of the outstanding equity securities or equity interests in a Person.

"*Representative*" – with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"*Securities Act*" – means the United States Securities Act of 1933, as amended, and the Rules and Regulations promulgated thereunder.

"*Seller*" – as defined in the first paragraph of this Agreement.



GPS Global Stock Purchase Agreement

"*Subsidiary*" – with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests have the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation of other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of the Company.

"*Tax Return*" – any return (including any information return), reporting, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any tax.

"*Threatened*" – a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made in writing or any notice has been given (in writing).

## 2.   PURCHASE AND SALE; CLOSING

### 2.1   PURCHASE AND SALE

Subject to the terms and conditions set forth herein, on the Closing Date (as defined in Section 2.4), Seller will sell and deliver to Buyer, and Buyer will purchase from Seller, the Company Shares free of any Encumbrances and together with all rights attaching thereto on the date of this Agreement.

### 2.2   [Reserved]

### 2.3   CONSIDERATION AND LOAN REPAYMENT

In consideration for the Company Shares, and subject to the terms and conditions herein, Buyer will pay Seller an aggregate amount of seven million eight hundred and eleven thousand four hundred and four US Dollars ($7,811,404) (the "Purchase Price"), payable as follows:

(a)   Cash Purchase Price. On the Closing Date, Buyer will pay to Seller by wire transfer in immediately available funds an amount equal to $311,404 (the "Cash Purchase Price").

(b)   Stock Purchase Price. The remaining Seven Million Five Hundred Thousand Dollars ($7,500,000) (the "Stock Purchase Price") will be paid in shares of $0.0001 par value common stock of Buyer (the "Common Stock"), as follows:

(i)   On the Closing Date the Buyer shall deliver to the Seller a number of shares of Common Stock (the "Initial Buyer Shares") determined by dividing $1,600,000

by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US) of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the Closing Date (the "Transaction Share Price"). The Initial Buyer Shares, when delivered to Seller, shall be free and clear from any Encumbrance.

(ii)     On the Closing Date, the Buyer shall deliver to Zions Bank Corporation, a national banking association (the "Escrow Agent") a number of shares of Common Stock equal to $2,900,000 divided by the Transaction Share Price (the "Restricted Stock") to be held and released by Escrow Agent as provided in the Escrow Agreement in the form attached hereto as Schedule 2.9(a)(viii) ("Escrow Agreement") and subject to the terms and conditions set forth in Section 2.9(b)(v).

(iii)    In addition, Buyer shall issue the Contingent Stock in an amount equal to $3,000,000 divided by the Transaction Share Price as provided and subject to the conditions set forth in Section 2.10.

(c)     Loan Repayment. On the Closing Date, Buyer will provide the Company with $188,596 (the "Loan Repayment Amount"), by wire transfer in immediately available funds, in addition to any obligation of the Buyer under the Loan and Funding Agreement, and such amount shall be immediately transferred by the Company to LineBit Systems Ltd. ($172,544) and Eytanim Building and Infrastructure Ltd. ($16,052), as repayment of loans provided to the Company by such entities, which are controlled by the Seller.

(d) On the Closing Date, Buyer will extend the NIS 2,000,000 loan provided to the Company in accordance with the Loan and Funding Agreement.

2.4    CLOSING

The closing of the purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Michael Hunter & Partners, counsel to Buyer located at 46 Rothschild Blvd, Tel Aviv, Israel 66883, at 17:00 (local time) on March 31, 2014 (with effect from April 1, 2014) or such later date that the parties agree to in writing, provided that all of the Closing conditions have been met or waived (the "Closing Date"). Failure to consummate the purchase and sale provided for in this Agreement on the date and time and at the place determined pursuant to this Section 2.4 will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.

2.5    [Reserved]

2.6    [Reserved]

2.7    RESTRICTED SECURITIES; RESTRICTIONS ON TRANSFER

The Company and the Seller hereby acknowledge and agree to the following:

(a)    Seller acknowledges that he is aware that the issuance of the Common Stock in connection with the Agreement has not been registered under the Securities Act. Seller is acquiring the Common Stock hereunder for his own account and not with a view to a distribution within the meaning of Section 2(11) of the Securities Act. The Common Stock acquired by Seller shall be subject to the restrictions of the Buyer's Insider Trading Policy and all applicable United States securities trading laws and regulations. Seller has such knowledge and experience in financial and business matters in general and investments in particular so as to be capable of evaluating the merits and risks of the acquisition of the Common Stock hereunder, and Seller has been advised by persons sophisticated in these matters and has retained legal counsel in connection with the transactions contemplated hereby.

(b)    Until the earlier date that the Common Stock is eligible for resale under Rule 144 promulgated under the Securities Act ("Rule 144") or the Registration Statement defined below is declared effective, all certificates representing Common Stock issued hereunder shall bear the following legend:

"The shares of SecureAlert, Inc. have not been registered under the Securities Act of 1933, as amended, or the securities laws of any state and may not be sold or otherwise disposed of except pursuant to an effective registration statement under such Act and applicable state securities laws or there is presented to SecureAlert, Inc. an opinion of counsel reasonably satisfactory to SecureAlert, Inc. to the effect that registration is not required."

(c)    Except as otherwise provided in this Agreement, Seller hereby agrees not to sell, offer, contract or grant any option to sell (including without limitation any short-sale) pledge, transfer, establish a "put-equivalent position" within the meaning of Rule 16a-1(h) under the Exchange Act, or otherwise dispose of any of the Restricted Stock received as a result of the Stock Purchase Price for a period commencing on the Closing Date and continuing for a period through and including the second anniversary of the Closing Date. For the removal of doubt, this section shall not apply with respect to the Initial Buyer Shares which shall be freely tradable provided that an applicable exemption from registration exists.

2.8    REGISTRATION

The Common Stock included in the Stock Purchase Price will be subject to registration by the Buyer upon a registration statement on Form S-1 (the "Registration Statement"). Buyer agrees to file the Registration Statement within 30 days of the date hereof, subject to receipt of all information required of the Company in connection with the preparation of such Registration Statement, including, without limitation, all financial statements and exhibits required to be filed with or as a part of such Registration Statement. Buyer shall use its best efforts to cause the Registration Statement to become effective within 90 days of the filing thereof and to make appropriate filings required to register the Common Stock. When the Registration Statement has

been declared effective by the Securities and Exchange Commission ("SEC"), the Common Stock will be unrestricted and free trading. Seller and Company will cooperate with Buyer in the preparation and filing of the Registration Statement. Buyer shall notify Seller prior to Closing in the event there is a delay anticipated in the effective date of the Registration Statement. Buyer and Seller agree that on the Closing Date the Restricted Stock and the Contingent Stock shall not be included in the Registration Statement and that all certificates representing the Restricted Stock and the Contingent Stock shall bear the legend referenced in paragraph 2.7(b) above until the holding period under Rule 144 of the Securities Act has been satisfied and the applicable Escrow Period has expired.

2.9     CLOSING OBLIGATIONS

At the Closing:

    (a)    Seller will deliver to Buyer:

        (i)    A share transfer deed effecting the transfer of the Company Shares to Buyer executed by the Seller, in the form attached hereto as Schedule 2.9(a)(i);

        (ii)    A Share Certificate representing the Company Shares, in the form attached hereto as Schedule 2.9(a)(ii);

        (iii)    A Notice to the Israeli Registrar of Companies executed by the Company notifying the registrar of the transfer of the Company Shares to Buyer, in the form of Schedule 2.9(a)(iii);

        (iv)    A resolution of the Board of Directors of the Company in the form of Schedule 2.9(a)(iv), approving the execution of the Agreement and all the Contemplated Transactions contemplated herein, including without limitation, the transfer of the Company Shares to Buyer;

        (v)    A resolution of the sole shareholder of the Company in the form of Schedule 2.9(a)(v), approving the execution of the Agreement and all the Contemplated Transactions contemplated herein;

        (vi)    Reserved;

        (vii)    Employment agreement with the Seller (including a non-competition undertaking) in the form of Schedule 2.9(a)(vii)A (the "Employment Agreement") executed by Seller and the Company; and

        (viii)    The Escrow Agreement executed by Seller and the Company, in the form of Schedule 2.9(a)(viii).

(b)     Buyer will deliver:

   (i)     To the Seller, the Cash Purchase Price, as provided in Section 2.3(a), subject to Israeli withholding tax obligations. Seller shall be entitled to provide the Buyer with a withholding tax exemption or reduction certificate and Buyer shall act accordingly;

   (ii)    To the Seller, a share transfer deed effecting the transfer of the Company Shares to Buyer executed by the Buyer;

   (iii)   To the Seller, a certificate for the Initial Buyer Shares, in the form of Schedule 2.9(b)(iii) reasonably acceptable to the Seller;

   (iv)    Reserved.

   (v)     To the Escrow Agent, certificates for the Restricted Stock, in the form of Schedule 2.9(b)(v)(a) reasonably acceptable to the Seller. The Restricted Stock shall not be tradable for a period of two (2) years from the Closing Date, and will be held in Escrow for a period of six (6) months following the Closing Date to allow the Buyer to verify that the Company's products operate in accordance with the specifications attached hereto as Schedule 2.9(b)(v)(b). The Seller, the Company and the Buyer shall work together and cooperate in good faith in resolving any non-compliance of the Company's products with such specifications during the aforementioned 6 months period.

   (vi)    Reserved.

   (vii)   The Escrow Agreement executed by Buyer; and

   (viii)  A loan and funding agreement in the form of Schedule 2.9(b)(viii) (the "Loan and Funding Agreement").

(c)     Buyer shall transfer to the Company the Loan Repayment Amount which shall be immediately transferred to the entities set forth in Section 2.3(c).

(d)     Buyer shall extend the NIS 2,000,000 loan provided to the Company in accordance with the Loan and Funding Agreement.

2.10    CONTINGENT SHARES

Buyer agrees to pay to Seller additional consideration for the Company Shares as follows:

(a)    Common Stock equivalent to $1,000,000 divided by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US) of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the date of issuance (the "First Contingent Stock") to be delivered to Seller within 30 days after the Company sells or leases (directly or through the Buyer) a minimum of 1,500 GPS tracking devices for offenders under "revenue generating contract(s)" as defined below.

(b)    Common Stock equivalent to $2,000,000 divided by the daily volume weighted average closing price (based on a trading day from 9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US) of the Common Stock on the over-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the date of issuance (the "Second Contingent Stock" and, together with the First Contingent Stock, referred to collectively herein as, the "Contingent Stock") within 30 days after the Company sells or leases (directly or through the Buyer) 2,500 GPS tracking devices for offenders under "revenue generating contract(s)".

(e)    For avoidance of doubt, the Parties agree that the 2,500 additional GPS tracking devices referenced in this Section 2.10(b) shall not include any GPS tracking devices under Section 2.10(a). "Revenue generating contract(s)" shall mean for purposes of this Section 2.10, contracts executed within 36 months of the Closing Date for (a) the sale of GPS devices and collection of proceeds at a sale price reasonably acceptable to Buyer, or (b) the execution of a contact for the lease of GPS devices with at least twenty-four (24) months of recurring revenues at a lease rate reasonably acceptable to Buyer.

(f)    The Contingent Stock will be subject to registration by the Buyer upon a Registration Statement. Buyer agrees to file the Registration Statement within 30 days of the date of issuance of the First Contingent Stock or the Second Contingent Stock (as applicable), subject to receipt of all information required of the Company in connection with the preparation of such Registration Statement, including, without limitation, all financial statements and exhibits required to be filed with or as a part of such Registration Statement. Buyer shall use its best efforts to cause the Registration Statement to become



effective within 90 days of the filing thereof and to make appropriate filings required to register the Contingent Stock. When the Registration Statement has been declared effective by the SEC, the Contingent Stock will be unrestricted and free trading. Seller and Company will cooperate with Buyer in the preparation and filing of the Registration Statement. Buyer shall notify Seller in the event there is a delay anticipated in the effective date of the Registration Statement. Subject to the above, the Contingent Stock shall be shall be free and clear from any Encumbrance.

2.11     GUARANTEES
At the Closing, or immediately as soon as practicable thereafter, upon notification by Seller, Buyer shall assume or cancel all guarantees or other obligations provided by the Seller, affiliates of the Seller and any Person on the Seller's behalf, for the benefit of the Company to the extent such current or past debt has been disclosed to the Buyer in the Disclosure Letter, including, without limitation, the guarantees set forth in **Schedule 2.11** attached hereto. The Company and the Buyer shall indemnify and hold harmless the Seller, affiliates of the Seller and any Person on the Seller's behalf for any loss, liability, claim, damage, expense (including costs of investigation and defense and reasonable attorneys' fees) incurred by any of them in connection with any such guarantee.

## 3.     REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows, in all material respects, with all such representations and warranties being deemed to be qualified for purposes of this Agreement by the attached Disclosure Letter of the Company and Seller (the "Disclosure Letter"), which Disclosure Letter is organized by section, subsection and paragraph references that correspond to the same sections, subsections and paragraphs of this Agreement. Any fact or item disclosed in any particular section of the Disclosure Letter shall be deemed to have been disclosed with respect to all other representations and warranties. Any and all undertakings, liabilities and actions of the Seller and the Company set forth in this Agreement are hereby generally disclosed.

3.1     ORGANIZATION AND GOOD STANDING

(a)     Part 3.1 of the Disclosure Letter contains a complete and accurate list for the Company of its name, its jurisdiction of incorporation, other jurisdictions in which it is authorized to do business, and its capitalization (including the identity of each shareholder or stockholder, as the case may be, and the number of shares held by each). The Company is a corporation duly organized and validly existing, under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Applicable Contracts. The Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.



(b)     Seller has delivered to Buyer copies of the Organizational Documents of the Company and each affiliate, as currently in effect.

## 3.2     AUTHORITY; NO CONFLICT

(a)     This Agreement constitutes the legal, valid, and binding obligation of Seller, enforceable against Seller in accordance with its terms. Upon the execution and delivery by Seller of the Escrow Agreement and the Employment Agreement (collectively, the "Seller's Closing Documents"), the Seller's Closing Documents will constitute the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Seller's Closing Documents and to perform his obligations under this Agreement and the Seller's Closing Documents.

(b)     Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

(i)      contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of the Company, or (B) any resolution adopted by the board of directors or the shareholders of the Company;

(ii)     contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which the Company or Seller, or any of the assets owned or used by the Company, may be subject;

(iii)    contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by the Company or that otherwise relates to the business of, or any of the assets owned or used by, the Company;

(iv)    cause any of the assets owned by the Company to be reassessed or revalued by any taxing authority or other Governmental Body;

(v)     contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Applicable Contract; or

(vi)    result in the imposition or creation of any Encumbrance upon or with respect to any of the assets owned or used by the Company.

Except as set forth in Part 3.2 of the Disclosure Letter, neither Seller nor the Company is or will be required to give any notice to or obtain any Consent from any Person in connection with the

GPS Global Stock Purchase Agreement

execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

(c)     Seller is an "accredited investor" as such term is defined in Rule 501(a) under the Securities Act.

## 3.3     CAPITALIZATION

The authorized share capital of the Company consists of 100 ordinary shares, nominal value NIS 1 per share, of which 100 shares are issued and outstanding and constitute the Company Shares. Seller is and will be immediately prior to the Closing Date the record and beneficial owner and holder of the Company Shares, free and clear of all Encumbrances. All of the outstanding equity securities and other securities of each Subsidiary of the Company are owned of record and beneficially by the Company, free and clear of all Encumbrances. No legend or other reference to any purported Encumbrance appears upon any certificate representing equity securities of any Subsidiary of the Company. All of the outstanding equity securities of each Subsidiary of the Company have been duly authorized and validly issued and are fully paid and nonassessable. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of the Company or any Subsidiary. None of the outstanding equity securities or other securities of the Company was issued in violation of any Legal Requirement. Neither the Company nor any Subsidiary of the Company owns, or has any Contract to acquire, any equity securities or other securities of any Person (other than the Company) or any direct or indirect equity or ownership interest in any other business.

## 3.4     FINANCIAL STATEMENTS

Seller has delivered to Buyer: (a) audited consolidated balance sheets of the Company in each of the years 2011 and 2012 and an unaudited consolidated balance sheets of the Company in 2013, and the related audited (other than with respect to 2013) consolidated statements of income, changes in shareholders' equity, and cash flow for each of the fiscal years then ended, together with the report thereon of Ronit Meir, C.P.A. (Isr), independent certified public accountants (the "Balance Sheet"), and (b) an unaudited consolidated balance sheet of the Company as at February 28, 2014 (the "Interim Balance Sheet"). Such financial statements and notes fairly present, in all material respects, the financial condition and the results of operations, changes in stockholders' equity, and cash flow of the Company as at the respective dates of and for the periods referred to in such financial statements, all in accordance with Israeli GAAP, subject, in the case of interim or unaudited financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be materially adverse) and the absence of notes (that, if presented, would not differ materially from those included in the Balance Sheet); the financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved. Except as set forth in Part 3.4, no financial statements of any Person other than the Company are required by GAAP to be included in the consolidated financial statements of the Company.

## 3.5     BOOKS AND RECORDS

GPS Global Stock Purchase Agreement

The books of account, minute books, stock record books, and other records of the Company, all of which have been made available to Buyer, are complete and correct in all material respects At the Closing, all of those books and records will be in the possession of the Company.

3.6    TITLE TO PROPERTIES

Part 3.6 of the Disclosure Letter contains a complete and accurate list of all real property, leaseholds, or other interests therein owned by the Company. Seller has delivered  or made available to Buyer copies of the deeds and other instruments (as recorded) by which the Company acquired such real property and interests, and copies of all title insurance policies, opinions, abstracts, and surveys in the possession of Seller or the Company and relating to such property or interests. The Company owns (with good and marketable title in the case of real property, subject only to the matters permitted by the  following sentence) all the properties and assets (whether real, personal, or mixed and whether tangible or intangible) that they purport to own located in the facilities owned or operated by the Company or reflected as owned in the books and records of the Company, including all of the properties and assets reflected in the Balance Sheet and the Interim Balance Sheet (except for assets held under capitalized leases disclosed or not required to be disclosed in Part 3.6 of the Disclosure Letter and personal property sold since the date of the Balance Sheet and the Interim Balance Sheet, as the case may be, in the Ordinary Course of Business).

3.7    CONDITION AND SUFFICIENCY OF ASSETS

Except as set forth in Part 3.7 of the Disclosure Letter, the buildings, plants, structures, and equipment of the Company are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they are being put, and none of such buildings, plants, structures, or equipment is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The building, plants, structures, and equipment of the Company are sufficient for the continued conduct of the Company's businesses after the Closing in substantially the same manner as conducted prior to the Closing.

3.8    ACCOUNTS RECEIVABLE

Except as set forth in Part 3.8 of the Disclosure Letter, all accounts receivable of the Company that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (collectively, the "Accounts Receivable") represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). There is no known contest, claim, or right of set-off, other than returns in the Ordinary

Course of Business, under any Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.8 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

3.9   INVENTORY

Except as set forth in Part 3.9 of the Disclosure Letter, all inventory own by the Company and reflected in the Interim Balance Sheet, consists of a quality and quantity usable and salable in the Ordinary Course of Business, except for obsolete items and items of below-standard quality, all of which have been written off or written down to net realizable value in the Interim Balance Sheet or on the accounting records of the Company as of the Closing Date, as the case may be. Except as set forth in Part 3.9 of the Disclosure Letter, the quantities of each item of inventory (whether raw materials, work- in-process, or finished goods) are not excessive, but are reasonable in the present circumstances of the Company.

3.10   NO UNDISCLOSED LIABILITIES

Except as set forth in Part 3.10 of the Disclosure Letter, the Company has no liabilities or obligations of any nature that would have been required to be reflected in, reserved against or otherwise described on the Balance Sheet or in the notes thereto in accordance with Israeli GAAP, and were not so reflected, reserved against or described, except for liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet and current liabilities incurred in the Ordinary Course of Business since the respective dates thereof.

3.11   TAXES

(a)   The Company has filed or caused to be filed (on a timely basis since the Company's formation) all Tax Returns that are or were required to be filed by or with respect to any of them, either separately or as a member of a group of corporations, pursuant to applicable Legal Requirements. The Company has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to those Tax Returns or otherwise, or pursuant to any assessment received by Seller or the Company, except such Taxes, if any, as are listed in Part 3.11 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves (determined in accordance with Israeli GAAP) have been provided in the Balance Sheet and the Interim Balance Sheet.

(b)   Part 3.11 of the Disclosure Letter contains a copy of all existing audits of all Tax Returns. All deficiencies proposed as a result of such audits have been paid, reserved against, settled, or, as described in Part 3.11 of the Disclosure Letter, are being contested in good faith by appropriate proceedings. Part 3.11 of the Disclosure Letter describes all adjustments to any Tax Returns filed by the Company or any group of corporations including the Company for all taxable years since the Company's formation, and the resulting deficiencies proposed by the applicable taxing authority. Except as described in Part 3.11 of the Disclosure Letter, neither the Seller nor the Company has given or been requested to give waivers or extensions (or is or would

be subject to a waiver or extension given by any other Person) of any statute of limitations relating to the payment of Taxes of the Company or for which the Company may be liable.

(c)     Except as set forth in Part 3.11 of the Disclosure Letter, the charges, accruals, and reserves with respect to Taxes on the respective books of the Company are adequate (determined in accordance with GAAP) and are at least equal to the Company's liability for Taxes. To the Company's Knowledge, there exists no proposed tax assessment against the Company except as disclosed in the Balance Sheet or in Part 3.11 of the Disclosure Letter. All Taxes that the Company is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)     Except as set forth in Part 3.11 of the Disclosure Letter, all Tax Returns filed by (or that include on a consolidated basis) the Company are true, correct, and complete. There is no tax sharing agreement that will require any payment by the Company after the date of this Agreement.

3.12    NO MATERIAL ADVERSE CHANGE

Except as set forth in Part 3.12, since the date of the Balance Sheet, there has not been any Material Adverse Change in the business, operations, properties, prospects, assets, or condition of the Company, and no event has occurred or circumstance exists that may result in such a material adverse change.

3.13    [Reserved]

3.14    COMPLIANCE    WITH    LEGAL    REQUIREMENTS;    GOVERNMENTAL AUTHORIZATIONS

(a)     Except as set forth in Part 3.14 of the Disclosure Letter:

(i)      The Company is, and at all times since its formation has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of its assets;

(ii)     no event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by the Company of, or a failure on the part of the Company to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature; and

(iii)    The Company has never received any written notice or other written communication (whether oral or written) from any Governmental Body or

any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of the Company to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

(b)      Part 3.14 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by the Company. Each Governmental Authorization listed or required to be listed in Part 3.14 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.14 of the Disclosure Letter:

  (i)    The Company is, and at all times has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.14 of the Disclosure Letter;

  (ii)   no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed in Part 3.14 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed in Part 3.14 of the Disclosure Letter;

  (iii)  The Company has never received any written notice or other written communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

  (iv)   all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.14 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

## 3.15   LEGAL PROCEEDINGS; ORDERS

(a)      To the Knowledge of Seller and the Company, except as set forth in Part 3.15 of the Disclosure Letter, there is no pending Proceeding:

  (i)    that has been commenced by or against the Company or that otherwise relates to or may affect the business of, or any of the assets owned or used

by, the Company; or

(ii)    that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Seller and the Company, (1) no such Proceeding has been Threatened in writing, and (2) no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such Proceeding. Seller has delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.15 of the Disclosure Letter.

(b)    Except as set forth in Part 3.15 of the Disclosure Letter,:

(i)    there is no Order to which the Company, or any of the assets owned or used by the Company, is subject;

(ii)    Seller is not subject to any Order that relates to the business of, or any of the assets owned or used by, the Company; and

(iii)    no officer, director, agent, or employee of the Company, as such, is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of the Company.

(c)    Except as set forth in Part 3.15 of the Disclosure Letter:

(i)    the Company is, and at all times has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the assets owned or used by it, is or has been subject;

(ii)    no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is subject; and

(iii)    the Company has not received, at any time, any written notice or other written communication from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which the Company, or any of the assets owned or used by the Company, is or has been subject.

3.16    ABSENCE OF CERTAIN CHANGES AND EVENTS

Except as set forth in Part 3.16 of the Disclosure Letter or contemplated under this Agreement,

since December 31, 2013, the Company has conducted its businesses only in the Ordinary Course of Business and there has not been any:

(a)    change in the Company's authorized or issued share capital; grant of any stock option or right to purchase shares of the Company; issuance of any security convertible into such shares; grant of any registration rights; purchase, redemption, retirement, or other acquisition by the Company of any such shares; or declaration or payment of any dividend or other distribution or payment in respect of shares of the Company;

(b)    amendment to the Organizational Documents of the Company;

(c)    payment or increase by the Company of any bonuses, salaries, or other compensation to any stockholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)    except as mandatory under any Legal Requirement, adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of the Company;

(e)    damage to or destruction or loss of any asset or property of the Company, whether or not covered by insurance, materially and adversely affecting the properties, assets, business, financial condition, or prospects of the Company, taken as a whole;

(f)    except in the Ordinary Course of Business, entry into, termination of, or receipt of notice of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Contract or transaction involving a total remaining commitment by or to the Company;

(g)    sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any asset or property of the Company or mortgage, pledge, or imposition of any lien or other encumbrance on any material asset or property of the Company, including the sale, lease, or other disposition of any of the Intellectual Property Assets;

(h)    cancellation or waiver of any claims or rights with a value to the Company;

(i)    any material change or amendment to a material Contract or material arrangement by which the Company or any of its assets or properties is bound or subject;

(j)    any loans made by the Company to its employees, officers, or directors other than travel advances made in the Ordinary Course of Business;

(k)    to the Knowledge of the Seller, any other event or condition of any character that would materially adversely affect the assets, properties, condition (financial or otherwise), operating results or business of the Company;

(l)    material change in the accounting methods used by the Company; or

(m)    agreement, arrangement or commitment, whether oral or written, by the Company to do any of the foregoing.

## 3.17   CONTRACTS; NO DEFAULTS

(a)    Part 3.17(a) of the Disclosure Letter contains a complete and accurate list, and Seller has delivered to Buyer true and complete copies, of:

      (i)    each Applicable Contract that involves performance of services or delivery of goods or materials by the Company of an amount or value in excess of $25,000.00;

      (ii)    each Applicable Contract that involves performance of services or delivery of goods or materials to the Company of an amount or value in excess of $25,000.00;

      (iii)    each Applicable Contract that was not entered into in the Ordinary Course of Business and that involves expenditures or receipts of the Company in excess of $25,000.00;

      (iv)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Applicable Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than $25,000 and with terms of less than one year);

      (v)    each licensing agreement or other Applicable Contract with respect to patents, trademarks, copyrights, or other intellectual property, not including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

      (vi)    each collective bargaining agreement and other Applicable Contract to or with any labor union or other employee representative of a group of employees;

      (vii)    each joint venture, partnership, and other Applicable Contract (however named) involving a sharing of profits, losses, costs, or liabilities by the Company with any other Person;

      (viii)    each Applicable Contract containing covenants that in any way purport to restrict the business activity of the Company or any affiliate of the Company or limit the freedom of the Company or any affiliate of the Company to engage in any line of business or to compete with any Person;

(ix)     each Applicable Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(x)     each power of attorney that is currently effective and outstanding;

(xi)     each Applicable Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by the Company or any affiliate to be responsible for consequential damages;

(xii)     each Applicable Contract for capital expenditures in excess of $25,000;

(xiii)     each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by the Company other than in the Ordinary Course of Business; and

(xiv)     each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

(b)     Except as set forth in Part 3.17(b) of the Disclosure Letter, Seller (and no Related Person of Seller) does not have nor may Seller acquire any rights under, or become subject to any obligation or liability under, any Contract that relates to the business of, or any of the assets owned or used by, the Company; and no officer or director (including Mr. Jacob Haran) of the Company is bound by any Contract that purports to limit the ability of such officer or director to (A) engage in or continue any conduct, activity, or practice relating to the business of the Company as currently being conducted, or (B) to the Knowledge of the Company, assign to the Company or to any other Person any rights to any invention, improvement, or discovery.

(c)     Except as set forth in Part 3.17(c) of the Disclosure Letter to the Knowledge of the Company, each Contract identified or required to be identified in Part 3.17(a) of the Disclosure Letter is in full force and effect and is valid and enforceable in accordance with its terms.

(d)     Except as set forth in Part 3.17(d) of the Disclosure Letter:

(i)     the Company is, and at all times since its inception has been, in compliance in all material respects with all applicable terms and requirements of each Contract under which the Company has or had any obligation or liability or by which the Company or any of the assets owned or used by the Company is or was bound;

(ii)     each other Person that has or had any obligation or liability under any Contract under which the Company has or had any rights is in full compliance with all applicable material terms and requirements of such Contract;



(iii)     the Company has not given to or received from any other Person, at any time, any written notice or other communication  regarding any actual, alleged, possible, or potential violation or breach of, or default under, any Contract.

(e)     There are no renegotiations of, attempts to renegotiate, or outstanding rights to renegotiate any material amounts paid or payable to the Company under current or completed Contracts with any Person and no such Person has made written demand for such renegotiation.

(f)     The Contracts relating to the sale, design, manufacture, or provision of products or services by the Company have been entered into in the Ordinary Course of Business and have been entered into without the commission of any act alone or in concert with any other Person, or any consideration having been paid or promised, that is or would be in violation of any Legal Requirement.

## 3.18   INSURANCE

(a)     Seller has delivered to Buyer true and complete copies of all policies of insurance to which the Company is a party or under which the Company, or any director of the Company, is covered.

(b)     Part 3.18 of the Disclosure Letter sets forth, by year, for the current policy year and each of the three (3) preceding policy years:

(i)     a summary of the loss experience under each policy; and

(ii)     a statement describing each claim under an insurance policy for an amount in excess of $5,000 which sets forth the claimant, description of the claim, policy information and description of loss.

(iii)     Except as set forth on Part 3.18 of the Disclosure Letter, all policies to which the Company is a party or that provide coverage to the Company, or any director or officer of the Company are valid and outstanding.

## 3.19   ENVIRONMENTAL MATTERS

To the Seller's Knowledge, except as set forth in Part 3.19 of the Disclosure Letter, the Company has not violated any applicable Environmental Law.

## 3.20   EMPLOYEES

(a)     Part 3.20 of the Disclosure Letter contains a complete and accurate list of the following information for each employee. Mr. Jacob Haran, Mr. Miki Naim or director of the Company, including; name; job title; current compensation paid or payable and social benefits, bonuses, commissions, profit shares, automobile, reimbursement of expenses and benefits in

kind ("Benefits") payable or which the Company is bound to provide (whether now or in the future); and vacation accrued.

(b)    No key employee of the Company has been dismissed in the last six months or has given notice of termination of his/her employment.

(c)    Except as set forth in Part 3.20 of the Disclosure Letter or as provided by the provisions of any applicable Israeli law and binding custom, there are no agreements or arrangements (whether legally enforceable or not) for the payment of any pensions, allowances, lump sums, or other like benefits on retirement or on death or termination or during periods of sickness or disablement for the benefit of any officer or former officer or employee or former employee of the Company or for the benefit of the dependents of any such individual in operation at the date hereof.

(d)    Except as set forth in Part 3.20 of the Disclosure Letter all the Benefits to which any officer or former officer or employee or former employee of the Company is or may be entitled including, inter alia, severance pay and leave, have been paid or have been contributed to funds managed on behalf of the employee or adequately provided for in the Balance Sheet.

(e)    Except as set forth in Part 3.20 of the Disclosure Letter the Company does not operate any share incentive scheme, share option scheme or profit sharing scheme for the benefit of any of its directors, officers, employees or consultants.

(f)    Except as set forth in Part 3.20 of the Disclosure Letter, and except for payments to the Seller under this Agreement, neither the execution, delivery or performance of this Agreement, nor the consummation of any of the other transactions contemplated by this Agreement, will result in any payment (including any bonus, golden parachute or severance payment) to any current or former employee or director of the Company (whether or not under any plan), or materially increase the benefits payable under any plan, or result in any acceleration of the time of payment or vesting of any such benefits.

(g)    Except as set forth in Part 3.20, to the Company's Knowledge the Company's employees are available to perform work in the scope of their employment with the Company.

(h)    Except as set forth in Part 3.20, the Company is in compliance in all material respects with all applicable legal requirements and contracts relating to employment, employment practices in the Company, wages, bonuses and terms and conditions of employment, including without limitation employee compensation matters such as payments to Managers Insurance or Pension Fund policies and to National Insurance Institute as required by law.

3.21    LABOR RELATIONS; COMPLIANCE

GPS Global Stock Purchase Agreement

Except as provided in <u>Part 3.21</u> of the Disclosure Letter, the Company is in compliance with the laws of Israel with regard to the length of the workday, overtime payments, minimum wages for employees, procedures for hiring and dismissing employees, determination of severance pay, annual leave, sick days, advance notice of termination of employment, equal opportunity and anti-discrimination laws and other conditions of employment. None of the Company's employees work under any collective bargaining agreements and the Company is in compliance with any and all extension orders issued by the Israeli Ministry of Industry, Trade and Labor applicable to it. The Company has never experienced labor-related work stoppages or strikes and believes that its relations with its employees are satisfactory.

3.22   INTELLECTUAL PROPERTY

(a)   <u>Intellectual Property Assets</u>. The term "<u>Intellectual Property Assets</u>" includes:

(i)   registered and unregistered trademarks (collectively, "<u>Marks</u>");

(ii)   all patents and patent applications (collectively, "<u>Patents</u>");

(iii)   all copyrights in published works (collectively, "<u>Copyrights</u>");

(iv)   all rights in mask works (collectively, "<u>Rights in Mask Works</u>"); and

(v)   all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, "<u>Trade Secrets</u>"); owned, used, or licensed by the Company as licensee or licensor.

(b)   <u>Agreements</u>.   <u>Part 3.22(b)</u> of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by the Company, of all Contracts relating to the Intellectual Property Assets to which the Company is a party or by which the Company is bound, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs or services with a value of less than $7,500 under which the Company is the licensee. There are no outstanding and, to Seller's Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c)   <u>Know-How Necessary for the Business</u>

(i)   The Intellectual Property Assets are all those necessary for the operation of the Company's businesses as they are currently conducted. The Company is the owner of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims, and has the right to use all of the Intellectual Property Assets.

    (ii)    Except as set forth in <u>Part 3.22(c)</u> of the Disclosure Letter, all former and current employees of the Company have executed written Contracts with the Company that assign to the Company all rights to any inventions, improvements, discoveries, or information relating to the business of the Company or assigned to the Company all such right according to the default rule of assignment under the Israeli Patent Law, 1967. To the Knowledge of the Seller, no employee of the Company is bound by any Contract with any third party that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than the Company. Notwithstanding the foregoing, Seller shall have all current and (if necessary) former employees sign intellectual property assignment agreements transferring any interest in applicable intellectual property to the Company.

(d)    <u>Patents</u>

    (i)    <u>Part 3.22(d)</u> of the Disclosure Letter contains a complete and accurate list and summary description of all Patents.

    (ii)    All of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

    (iii)    No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding. To Seller's Knowledge, there is no potentially interfering patent or patent application of any third party.

    (iv)    No Patent owned by the Company is infringed or, has been challenged or threatened in any way.

    (v)    All products made, used, or sold under the Patents have been marked with the proper patent notice.

(e)    <u>Trademarks</u>

    (i)    <u>Part 3.22(e)</u> of Disclosure Letter contains a complete and accurate list and summary description of all Marks.

    (ii)    All Marks that have been registered with the United States Patent and Trademark Office, the Israel Patent Office (or equivalent in any other jurisdiction where the Mark is used) are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or

actions falling due within ninety days after the Closing Date.

(iii)  No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Seller's Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)  No Mark is infringed or, to Seller's Knowledge, has been challenged or threatened in any way.

(v)  All products and materials containing a Mark bear the proper registration notice where permitted by law.

(f)  Copyrights.

(i)  Part 3.22(f) of the Disclosure Letter contains a complete and accurate list and summary description of all Copyrights.

(ii)  All the registered Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(iii)  All works encompassed by the Copyrights have been marked with the proper copyright notice.

(g)  Trade Secrets.

(i)  The Company has taken all reasonable precautions to protect the secrecy, confidentiality, and value of its Trade Secrets.

## 3.23   CERTAIN PAYMENTS

Neither the Company nor any director, officer, agent, or employee of the Company, or any other Person associated with or acting for or on behalf of the Company, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of the Company or any affiliate of the Company, or (iv) in violation of any Legal Requirement, or (b) established or maintained any fund or asset for the Company that has not been recorded in the books and records of the Company or Seller.

3.24   DISCLOSURE

(a)   No representation or warranty of Seller in this Agreement and no statement in the Disclosure Letter contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)   There is no fact known to Seller that has specific application to Seller or the Company (other than general economic or industry conditions) and that materially adversely affects the assets, business, prospects, financial condition, or results of operations of the Company (on a consolidated basis) that has not been set forth in this Agreement or the Disclosure Letter.

3.25   RELATIONSHIPS WITH RELATED PERSONS

The directors of the Company are as set forth in Part 3.25 of the Disclosure Letter. All agreements, commitments and understandings, whether written or oral, with respect to any compensation to be provided by the Company to any of the Company's directors or officers are set forth in Part 3.25 of the Disclosure Letter. Neither Seller nor any Related Person of Seller or of the Company has any interest in any property (whether real, personal, or mixed and whether tangible or intangible), used in or pertaining to the Company's businesses. Neither the Seller nor any Related Person of Seller owns (of record or as a beneficial owner) an equity interest or any other financial or profit interest in, a Person that has (i) had business dealings (other than provision of loans to the Company) or a material financial interest in any transaction with the Company, or (ii) engaged in competition with the Company with respect to any line of the products or services of the Company (a "Competing Business") in any market presently served by the Company. Except as set forth in Part 3.25 of the Disclosure Letter, neither the Seller nor any Related Person of Seller is a party to any Contract with, or has any claim or right against, the Company. All outstanding shareholder loans have been converted or will be repaid in full on or prior to the Closing Date, and the Seller hereby releases the Company from any liability related to such shareholder loans.

3.26   BROKERS OR FINDERS

Seller and his agents and the Company have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement.

4.   REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

4.1   ORGANIZATION AND GOOD STANDING

Buyer is a corporation duly organized, validly existing, and in good standing under the laws of

GPS Global Stock Purchase Agreement

the State of Utah, U.S.A., with the requisite corporate power and authority to own its properties and to conduct its business as now conducted.

## 4.2   AUTHORITY; NO CONFLICT

(a)   This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the Escrow Agreement, the Loan and Funding Agreement, and related documents (collectively, the "Buyer's Closing Documents"), the Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with its respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement and the Buyer's Closing Documents and to perform its obligations under this Agreement and the Buyer's Closing Documents. The Buyer has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the Contemplated Transactions, including without limitation to issue, sell and deliver the Initial Buyer Shares, the Restricted Stock and the Contingent Stock. The execution, delivery and performance of this Agreement and the Contemplated Transactions have been duly authorized by all necessary corporate action of the Buyer. This Agreement and the Contemplated Transactions have been duly executed and delivered by the Buyer. Each of this Agreement and the Contemplated Transactions constitutes a legal, valid and binding obligation of the Buyer, enforceable against the Buyer according to its terms.

(b)   Except as set forth in Schedule 4.2, neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to:

(i)   any provision of Buyer's Organizational Documents;

(ii)   any resolution adopted by the board of directors or the shareholders of Buyer;

(iii)   any Legal Requirement or Order to which Buyer may be subject; or

(iv)   any Contract to which Buyer is a party or by which Buyer may be bound.

Except as set forth in Schedule 4.2, Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

(c) The execution and delivery by the Buyer of, and the performance by the Buyer of, its obligations under this Agreement and the Contemplated Transactions do not and will not (i) violate any provision of any applicable Utah state or federal law, statute, rule or regulation, (ii) violate any provision of the Buyer's Articles of Incorporation or Bylaws, or (iii) violate any judgment, order, writ, injunction or decree of any governmental agency or body Known applicable to the Buyer.

(d) The execution and delivery by the Buyer of, and the performance by the Buyer of its obligations under, this Agreement and the Contemplated Transactions, including the issuance, sale and delivery of the Initial Buyer Shares, the Restricted Stock and the Contingent Stock, do not require (on the part of the Buyer) any consents, approvals, permits, orders or authorizations of, or qualifications, registrations, designations, declarations or filings with, any Utah corporate or governmental authority, or any U.S. federal regulatory authority.

(e) Except as disclosed in this Agreement and public filings of the Buyer, there is no action, suit, arbitration, proceeding, litigation or investigation pending against the Buyer or its properties before any court, arbitrator or governmental agency, nor, to its Knowledge, has the Buyer received any written threat thereof, (i) that questions the validity of this Agreement or the Contemplated Transactions or the right of the Buyer to enter into and perform its obligations under this Agreement or the Contemplated Transactions, including without limitation the issuance, sale and delivery of the Initial Buyer Shares, the Restricted Stock and the Contingent Stock, or (ii) that, if determined adversely, would be likely to result in a material adverse change in the financial condition, business, assets, or operations of the Buyer.

(f) The sale and issuance of the Initial Buyer Shares, the Restricted Stock and the Contingent Stock to the Seller is exempt from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act").

## 4.3   INVESTMENT INTENT

Buyer is acquiring the Shares for its own account and not with a view to their distribution within the meaning of Section 2(11) of the Securities Act.

## 4.4   CERTAIN PROCEEDINGS

There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions. To Buyer's Knowledge, no such Proceeding has been Threatened.

## 4.5 BROKERS OR FINDERS

Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

## 4.5   DUE DILIGENCE

Buyer acknowledges that it has had the opportunity to conduct due diligence and investigation with respect to the Company of the materials provided to the Buyer, to the Buyers satisfaction. Any claims the Buyer may have for breach of representation or warranty shall be

based solely on the representations and warranties set forth in Section 3. Buyer further acknowledges that none of the Company or the Seller have made any representation or warranty, express or implied, not expressly set forth in this Agreement. In no event shall the Seller have any liability to the Buyer with respect to a breach of representation, warranty or covenant under this Agreement to the extent that the Buyer Knew of such breach as of the Closing Date. The burden of proof in any claim, action or proceedings with respect to such Knowledge of the Buyer shall be on the Seller.  Buyer represents and warrants that the Buyer has no Knowledge of any such breach.

**5.**     **RESERVED**

**6.**     **RESERVED**

**7.**     **CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE**

Buyer's obligation to purchase the Shares and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived, in writing, by Buyer, in whole or in part):

7.1     ACCURACY OF REPRESENTATIONS

All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), as qualified by the Disclosure Letter, must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, provided, however, that from time to time prior to the Closing, the Seller shall have the right to supplement or amend the Disclosure Letter with respect to any matter arising after the delivery of the Disclosure Letter.

7.2     SELLER'S PERFORMANCE

All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), including without limitation delivery to Buyer of the documents to be delivered by Seller to Buyer pursuant to Section 2.9 above, must have been duly performed and complied with in all material respects.

7.3     CONSENTS

Each of the Consents identified in Part 3.2 of the Disclosure Letter must have been obtained and must be in full force and effect.

7.4   ADDITIONAL DOCUMENTS

Each of the following documents must have been delivered to Buyer:

such other documents as Buyer may reasonably request for the purpose of (i) evidencing the accuracy of any of Seller's representations and warranties, (ii) evidencing the performance by Seller of, and the compliance by Seller with, any covenant or obligation required to be performed or complied with by Seller prior to Closing, (ii) evidencing the satisfaction of any condition referred to in this Section 7, or (iv) otherwise facilitating the consummation or performance of any of the Contemplated Transactions.

7.5   NO PROCEEDINGS

Since the date of this Agreement, there must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

7.6   NO CLAIM REGARDING SHARE OWNERSHIP OR SALE PROCEEDS

There must not have been made or Threatened by any Person any claim asserting that such Person (a) is the holder or the beneficial owner of, or has the right to acquire or to obtain beneficial ownership of, any stock of, or any other voting, equity, or ownership interest in, the Company, or (b) is entitled to all or any portion of the Purchase Price payable for the Company Shares.

7.7   NO PROHIBITION

Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

7.8   NO MATERIAL ADVERSE EFFECT

No material adverse effect to the condition of the Company shall have taken place that, when taken individually or together with all other events, changes or effects, is or is reasonably expected to be, materially adverse to the business, condition, assets, liabilities, operations or financial performance or prospects of the Company, or to prevent or materially delay consummation of the transactions contemplated under this Agreement.

## 8.   CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to sell the Company Shares and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived, in writing, by Seller, in whole or in part):

### 8.1   ACCURACY OF REPRESENTATIONS

All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

### 8.2   BUYER'S PERFORMANCE

(a)   All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)   Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.9 and must have complied with the terms of Section 2.9.

### 8.3   CONSENTS

Each of the Consents identified in Part 3.2 of the Disclosure Letter, and each Consent identified in Schedule 4.2, must have been obtained and must be in full force and effect.

### 8.4   ADDITIONAL DOCUMENTS

Buyer must have caused the following documents to be delivered to Seller: such documents as Seller may reasonably request for the purpose of (i) evidencing the accuracy of any representation or warranty of Buyer, (ii) evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer, (iii) evidencing the satisfaction of any condition referred to in this Section 8, or otherwise facilitating the consummation of any of the Contemplated Transactions.

### 8.5   NO INJUNCTION

There must not be in effect any Legal Requirement or any injunction or other Order that (a) prohibits the sale of the Shares by Seller to Buyer, and (b) has been adopted or issued, or has otherwise become effective, since the date of this Agreement.

Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Seller or any Person affiliated with Seller to

suffer any material adverse consequence under, (a) any applicable Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

### 8.6   ADDITIONAL COVENANTS

Buyer shall release the Seller from guarantees provided by the Seller or any affiliate of the Seller or any Person on the Seller's behalf in accordance with Section 2.11 and to the extent required to be done prior to the Closing.

### 9.   RESERVED

### 10.   INDEMNIFICATION; REMEDIES

### 10.1   SURVIVAL

All representations, warranties, covenants and obligations of the Seller in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, and any certificate or document delivered pursuant to this Agreement will survive the Closing through the first anniversary of the Closing Date and shall expire upon the first anniversary of the Closing Date; however, representations, warranties, covenants and obligations of Seller in this Agreement related to intellectual property, taxes, environmental matters, capitalization, the item referred to in Section 10.2(d) and fraud or willful misconduct shall survive until the lapse of the relevant statute of limitations. Notwithstanding the foregoing, the survival period of any representations, warranties, covenants and obligations of the Seller in this Agreement shall not expire to the extent that an indemnification claim is made with respect to a third party claim under section 10.8 prior to the survival expiration period of such representation, warranty or covenant with respect to such indemnification claim only and until such claim is finally settled.

### 10.2   INDEMNIFICATION AND PAYMENT OF DAMAGES BY SELLER

Subject to the limitations set forth in this Section 10 below, Seller will indemnify and hold harmless the Buyer and/or the Company (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss or damage expense (including reasonable attorneys' fees), whether or not involving a third-party claim (collectively, "Damages"), arising directly, from or in connection with:

(a)   any Breach of any representation or warranty made by Seller in this Agreement;

(b)   any Breach by Seller of any covenant or obligation of Seller in this Agreement; and

(c)   Damages caused by the Company's failure to cancel the power of attorney disclosed in Schedule 3.17 of the Disclosure Letter.

(d)     Damages caused as a result of the first item listed in Schedule 3.21 of the Disclosure Letter with respect to the period prior to the Closing Date.

(e)     Damages caused as a result of the second item listed in Schedule 3.22 of the Disclosure Letter with respect to the period prior to the Closing Date.

10.4   INDEMNIFICATION AND PAYMENT OF DAMAGES BY BUYER

Buyer will indemnify and hold harmless Seller for, and will pay to Seller the amount of any Damages arising, directly from or in connection with (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

10.5   MINIMUM CLAIM AMOUNT – SELLER

Seller will have no liability (for indemnification or otherwise) with respect to the matters described in this Section 10 until the total of all Damages with respect to such matters exceeds $50,000; provided, however, that should there be Damages in excess of $50,000 then Buyer shall also be indemnified for the initial $50,000 of Damages.

10.6   MINIMUM CLAIM AMOUNT – BUYER

Buyer will have no liability (for indemnification or otherwise) with respect to the matters described in Section 10 until the total of all Damages with respect to such matters exceeds $50,000; provided, however, that should there be Damages in excess of $50,000 then Seller shall also be indemnified for the initial $50,000 of Damages. For the removal of doubt, this Section 10.5 shall not apply to indemnification under Section 2.11.

10.6A  NO CONSEQUENTIAL DAMAGES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL DAMAGES OR DAMAGES TO REPUTATION OR GOODWILL ARISING OUT OF OR OTHERWISE RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES.

10.6B  LIMITATION OF SELLER'S LIABILITY
(a) The Buyer's  sole and exclusive remedy under this Agreement and the Contemplated Transactions shall be claimed against and sought from the Restricted Stock and the Contingent Stock, and the Buyer shall not be entitled to any remedy against the Seller, monetary or

otherwise, other than the return to Buyer of such number of shares of Common Stock out of the Restricted Stock and the Contingent Stock, which is the quotient of (a) the Seller's Damages, divided by (b) the daily volume weighted average closing price (based on a trading day from (9:30 a.m. to 4:00 p.m., eastern time and as reported by Bloomberg Financial LP at http://www.bloomberg.com/quote/SCRA:US) of the Common Stock on the other-the-counter bulletin board (or such other exchange on which Buyer's shares are traded) for a period consisting of 60 consecutive trading days ending on the third Business Day prior to the date that a right of indemnification arises for Buyer (the "Indemnification Right Stock Value"), as agreed to by the parties, or as confirmed by an arbitrator or court. Notwithstanding the aforementioned, in the event that the Seller sells any of the Restricted Stock or the Contingent Stock (if received), then the Indemnified Persons' recourse shall include cash with a value of the Indemnification Right Stock Value of the sold Restricted Stock or the sold Contingent Stock, provided that any remedy available shall be first claimed against and sought from the Restricted Stock and the Contingent Stock owned by the Seller.

(b) Without derogating from Section 10.6B(a) above, in no event shall the monetary value of the aggregate liability of the Seller under this Agreement and the Contemplated Transactions (other than the Employment Agreement) exceed US$ 5,900,000.

### 10.6C   MITIGATION OF LOSSES

The Buyer and the Company shall use all reasonable efforts to mitigate any loss for which a claim under this Agreement may be raised.

### 10.7   RIGHT OF SET-OFF

Buyer may not set off any amount to which it may be entitled under this Section 10 against amounts otherwise payable under this Agreement.

### 10.8   PROCEDURE FOR INDEMNIFICATION--THIRD PARTY CLAIMS

(a)     Promptly after receipt by an indemnified party under Section 10.2 and 10.4 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)     If any Proceeding referred to in Section 10.8(a) is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capacity to defend such Proceeding and provide  indemnification with respect to such Proceeding), to assume the defense of such

Proceeding with counsel reasonably satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not be liable to the indemnified party for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be effected by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, or (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (ii) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within fifteen days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(c)     Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(d) Without derogating from subsections (a)-(c) above, in any event that an indemnifiable claim under this Agreement is handled by the indemnified party, the counsel retained by the indemnified party shall be reasonably satisfactory to the indemnifying party.

## 10.9   PROCEDURE FOR INDEMNIFICATION – OTHER CLAIMS

A claim for indemnification for any matter not involving a third-party claim may be asserted by written notice to the party from whom indemnification is sought.

## 10A.   POST CLOSING

## 10A.1  WAIVER AND RELEASE

The Company does, for itself and its Related Persons (the "Releasors") irrevocably, unconditionally and absolutely release, acquit and forever discharge the Seller and any Related

Person of the Seller, from any and all disputes, claims, demands, liabilities, actions, and causes of action the Releasors may have had in the past or may have at the Closing, against Seller and any Related Person of the Seller for pre-Closing events, other than any rights of the Buyer expressly provided under this Agreement or the Contemplated Transactions.

The Seller does, for himself and his Related Persons (the "Seller Releasors") irrevocably, unconditionally and absolutely release, acquit and forever discharge the Buyer and any Related Person of the Buyer, from any and all disputes, claims, demands, liabilities, actions, and causes of action the Seller Releasors may have had in the past or may have at the Closing, against Buyer and any Related Person of the Buyer for pre-Closing events, other than any rights of the Seller expressly provided under this Agreement or the Contemplated Transactions.

## 10A.2 EARN-OUT PROTECTIVE PROVISIONS

(a)     The Buyer agrees and acknowledges that the Seller has entered into the transactions contemplated by this Agreement, in reliance on the Buyer's unconditional obligation to provide the Company with funding, as contemplated under the Loan and Funding Agreement. Any Breach by the Buyer of the Loan and Funding Agreement shall be deemed a material breach under this Agreement.

(b) Until the third anniversary of the Closing Date:

(i) the Buyer, and any Related Person of the Buyer, shall not compete with the Company in tenders or request for proposal in which the Company is currently involved.

(ii) the Buyer, and any Related Person of the Buyer shall not solicit or entice, directly or indirectly any person who is an employee or service provider or independent contractor of the Company to terminate his or her relationship with the Company, or to refrain from extending or renewing such relationship (upon the same or new terms), or to become employed by or engaged with the Buyer or any Related Person of the Buyer, without the agreement of the Seller.

(iii) Seller shall be entitled to nominate one member to the Board of Directors of the Buyer and to appoint one member to the Board of Directors of the Company and replace such member.

(c) For as long as the Seller's Employment Agreement is in force and effect, and provided no notice of termination has been provided, Seller shall be entitled to full day-to-day managerial authority of the Company's business, including, without limitation, hiring and firing of employees and preparing and adopting marketing plans.

(d) The parties agree to act in good faith to allow the Seller to reach his Contingent Stock milestones set forth in Section 2.10 as long as it does not prejudice the reasonable business interests of the Company as determined by the board of directors of the Company.

## 10A.3 EMPLOYMENT AGREEMENTS

Seller and Buyer agree to assist the Company in good faith to cause mutually agreed upon key employees to enter written employment agreements with the Company in a form that is agreed upon by all the parties.

## 11.    GENERAL PROVISIONS

### 11.1    EXPENSES

Except as otherwise expressly provided in this Agreement, Seller will bear the expenses of the Company and each of Seller and Buyer will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

### 11.2    PUBLIC ANNOUNCEMENTS

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued, if at all, at such time and in such manner as Buyer determines. Unless consented to by Buyer in advance or required by Legal Requirements, prior to the Closing Seller shall, and shall cause the Company to, keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person. Seller and Buyer will consult with each other concerning the means by which the Company's employees, customers, and suppliers and others having dealings with the Company will be informed of the Contemplated Transactions, and Buyer will have the right to be present for any such communication.

### 11.3    CONFIDENTIALITY

Between the date of this Agreement and the Closing Date, Buyer and Seller will maintain in confidence, and will cause the directors, officers, employees, agents, and advisors of Buyer and the Company to maintain in confidence, any written, oral, or other information obtained in confidence from another party or the Company in connection with this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by legal proceedings.

If the Contemplated Transactions are not consummated, each party will return or destroy as much of such written information as the other party may request.

### 11.4    NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by an internationally recognized overnight delivery service (receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

Seller:
Eli Sabag
Hamaapilim 14,
Kfar Saba

with copies (which shall not constitute notice) to:
Erdinast, Ben Nathan & Co., Advocates
Museum Tower – 13th floor, 4 Berkowitz St.Tel Aviv
Attn: Yoav Dankner, Adv. and Jonathan Raz, Adv.

Buyer:
SecureAlert, Inc.
150 W. Civic Center Drive
Suite 400
Sandy, Utah 84070
Attn:        Chief Executive Officer
Facsimile No.: +1 (801) 451-6281

with copies (which shall not constitute notice) to:

Durham Jones & Pinegar
111 East Broadway, Suite 900
Salt Lake City, UT 84111
Attention:    Kevin Pinegar
Facsimile No.: +1 801.415.3500

and:
Michael Hunter & Partners
46 Rothschild Blvd.
Tel Aviv 66883
Israel
Attention:    Eric Wachstock
Facsimile No.: +972-3-566-2566

11.5   DISPUTES, ARBITRATION, JURISDICTION; SERVICE OF PROCESS

   (a)    <u>Litigation Rights Reserved</u>.  If any dispute arises with respect to the unauthorized use of confidential information, the aggrieved party may seek any available remedy at law or

GPS Global Stock Purchase Agreement

equity from a court of competent jurisdiction, in addition to its right to arbitration as provided in this Section 11.5.

(b)     Arbitration.  Except as provided in Section 11.5(a) above, any dispute, claim or controversy which shall arise out of or in relation to this Agreement, or the breach thereof, shall be settled by binding arbitration.  Any such arbitration shall be held in New York, New York U.S.A. in accordance with the Rules of the International Centre for Dispute Resolution in accordance with its international Arbitration Rules (the "Rules"), which Rules are deemed to be incorporated by reference.  Any such arbitration shall be conducted by one (1) arbitrator appointed by the International Centre for Dispute Resolution.  However, such arbitrator shall be an experienced business attorney with background in international stock purchases.  The arbitration shall be conducted in the English language. Notwithstanding any contrary provisions in the Rules, each party shall bear its own costs and expenses of the arbitration and one-half (1/2) of the fees and costs for the arbitrators unless the arbitrator determines the fees and costs should be borne by one of the parties.  The arbitrator may not award or assess punitive damages against either party.

(c)     Jurisdiction; Services of Process.  Any action or proceeding under Section 11.5(a) above and any action or proceeding seeking to enforce any decision of the arbitration under Section 11.5(b) above shall be brought against any of the parties exclusively in the state or federal courts located in the State of Utah, County of Salt Lake, U.S.A. and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

## 11.6   FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

## 11.7   WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative and the sole remedy the parties may have against each other shall be as set forth in this Agreement and the Contemplated Transactions. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it

is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

## 11.8   ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter (including the Letter of Intent between Buyer and Seller dated December 17, 2013) and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

## 11.9   (RESERVED)

## 11.10   ASSIGNMENTS, SUCCESSORS, AND NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties. This Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

## 11.11   SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## 11.12   SECTION HEADINGS, CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

## 11.13   TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

11.14 GOVERNING LAW

Other than with respect to the matter of the transfer of the Company Shares to Buyer, which shall be governed by and interpreted and construed in accordance with the laws of the State of Israel without regard to conflicts of laws principles, this Agreement shall be governed by and interpreted and construed in accordance with the laws of the State of New York, U.S.A. without regard to conflicts of laws principles.

11.15 COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

11.16 LANGUAGE AND CURRENCY

The language of the Agreement shall be the English language, which shall be the binding and controlling language for all matters relating to the meaning or interpretation of this Agreement. The monetary currency of the Agreement shall be in U.S. Dollars and all of the Contemplated Transactions (other than the Employment Agreement) shall be reflected in U.S. Dollars.

[Signature page follows]

**IN WITNESS WHEREOF**, the parties have executed and delivered this Agreement as of the date first written above.

BUYER                                                    SELLER

SECUREALERT, INC.

By: _____
    Guy Dubois, Chairman

THE COMPANY

GPS GLOBAL TRACKING AND SURVEILLANCE SYSTEM LTD.

By: _____
Its: _____

49D14-1805-PL-017647
Marion Superior Court, Civil Division 14

Filed: 5/4/2018 5:30 PM
Myla A. Eldridge
Clerk
Marion County, Indiana

# LOAN AGREEMENT

This Loan Agreement ("Agreement") is entered into and effective as of March 16th, 2014 (the "Effective Date"), by and between

Sapinda Asia Limited, a BVI limited liability company with its registered address at OMC Chambers, Wickhams Cay 1, Road Town, Tortola, BVI  ("Lender"), a stockholder of SecureAlert, Inc., a Utah corporation ("Company"), and

Eli Sabag, an Israeli resident, residing at ███████████████ (including his designees, successors and assigns, the "Borrower"). The Lender and the Borrower may each be referred to herein as a "Party" and collectively as the "Parties."

Lender and Borrower hereby agree as follows:

1.  <u>Loan.</u>

    (a) Lender shall lend the Borrower US$1,600,000 (the "Loan"). The Loan amount will be delivered to the Borrower no later than March 28, 2014, in wire transfer of immediately available funds to the Borrower's bank account according to the details attached hereto as **Schedule A.** The Loan shall not bear any interest and shall not be linked to any index.

    (b) On or before the nine-month anniversary date the Loan is lent to Borrower (the "Due Date") Borrower shall, at the Borrower's sole discretion, either (i) repay the Loan, or (ii) provide the Lender with the Initial Buyer Shares, as such term is defined in that Share Purchase Agreement by and between the Borrower, the Company and GPS Global Tracking and Surveillance System Ltd. (the "SPA"), after registration and in an "electronic" method of transfer (not by transfer of a hard-copy stock certificate), regardless of the then-applicable value of such Initial Buyer Shares (each a "Loan Settlement"), and in such event the Loan shall immediately become settled, discharged and extinguished. Failure to settle the Loan on or before the Due Date shall constitute an Event of Default under Section 5 below.

2.  <u>Fee.</u> Borrower shall not be required to pay to Lender any fees in connection with the Loan.

3.  <u>Pre-payment.</u> Borrower may, on or prior to the Due Date, settle the Loan, in whole or in part, at any time or from time to time, without penalty or premium.

4.  <u>Event of Default.</u>  Failure by the Borrower to settle the Loan on or before the Due Date shall constitute an "Event of Default" pursuant to this Agreement.

5.  <u>Representations, Warranties and Covenants.</u> Lender hereby represents, warrants and covenants to Borrower as follows:

(a)     Lender is not, and within 90 days of the Effective Date has not been an officer, director, representative or affiliate of Company.

(b)     Except as expressly stated herein, Lender is not, directly or indirectly, receiving any consideration from or being compensated in any manner by, and will not at any time in the future accept any consideration or compensation from, Company, any affiliate of Company, or any other person for entering into this Agreement. There is no restriction applicable to the Lender, under law or otherwise, which may prevent the Lender from receiving the Initial Buyer Shares as full and absolute discharge of the Loan.

(c)     Lender is a limited liability company duly organized, validly existing, and in good standing under the laws of the British Virgin Islands.

(d)     This Agreement constitutes the legal, valid, and binding obligation of Lender, enforceable against it in accordance with its terms. Lender has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement.

(e)     The execution, delivery and performance of this Agreement by Lender will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under or give rise to any right or obligation under, any provision of (i) the incorporation documents of Lender; (ii) any applicable law; or (iii) any contract.

(f)     Lender is not and will not be required to obtain any consent from any third party in connection with the execution, delivery and performance of this agreement.

(g)     Lender acknowledges that the Borrower has entered into the SPA in reliance on Lender's representations, warranties and undertakings set forth in this Agreement, and without such representations, warranties and undertakings, the Borrower would not have entered into the SPA.

7.     <u>Fees and Expenses</u>. Each party shall pay the fees and expenses of its advisers, counsel, accountants and other experts, if any, and all other expenses incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.

8.     <u>Construction</u>. The headings herein are for convenience only, do not constitute a part of this Agreement and shall not be deemed to limit or affect any of the provisions hereof. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

9.     Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.

10.     No Third-Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective successors and permitted assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

11.     Reserved.

12.     Termination; Survival. This Agreement shall terminate when the Loan is settled. The representations and warranties contained herein shall survive until the Loan is settled.

13.     Execution. This Agreement may be executed by facsimile or electronic transmission and in two or more counterparts, all of which when taken together shall be considered one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party, it being understood that both parties need not sign the same counterpart. In the event that any signature is delivered by facsimile transmission, email or electronic file, such signature shall create a valid and binding obligation of the party executing (or on whose behalf such signature is executed) with the same force and effect as if such facsimile signature page were an original thereof.

14.     Severability. If any provision of this Agreement is held to be invalid or unenforceable in any respect, the validity and enforceability of the remaining terms and provisions of this Agreement shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision that is a reasonable substitute therefore, and upon so agreeing, shall incorporate such substitute provision in this Agreement.

15.     Amendments; Waivers. No provision of this Agreement may be waived or amended except in a written instrument signed, in the case of an amendment, by the Lender and Borrower or, in the case of a waiver, by the party against whom enforcement of any such waiver is sought. No waiver of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any subsequent default or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of either party to exercise any right hereunder in any manner impair the exercise of any such right.

16.     Entire Agreement. This Agreement contains the entire agreement and understanding of the parties, and supersedes all prior and contemporaneous agreements, understandings, communications and discussions, both oral and written. No party, representative, attorney or agent has relied upon any collateral contract, agreement, assurance, promise, understanding or representation not expressly set forth herein above. The parties hereby waive all rights and remedies, at law and in equity, arising out of, relating to, or which may arise as the result of, any person's reliance on any such



assurance. The parties acknowledge that all prior agreements have been merged into this Agreement.

[SIGNATURE PAGE FOLLOWS.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized signatories as of the date first indicated above.

Lender
For and on behalf of Sapinda Asia

_____
By Ms. Tatiana Cohen,
Under power of attorney

Borrower

_____
Eli Sabag

# PUT OPTION AGREEMENT

**MARCH 16, 2014**

**Put Option Agreement
relating to
shares in SecureAlert, Inc.**





EXHIBIT 4

**THIS AGREEMENT** is made on March 16, 2014

**BETWEEN:**

(1)     **MR E. SABAG**, residing at ███████████ born on ███████ in Kfar Saba, Israel and holder of an Israeli ID with number ██████ (the **Seller**);

(2)     **SAPINDA ASIA LIMITED**, a limited liability company under the laws of the British Virgin Islands, having its registered office at OMC Chambers, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands (**Sapinda Asia**); and

(3)     **MR L. WINDHORST**, residing at █████████████████████ born in Rahden, Germany, on the ██████████ and holder of a German passport with number █████████ (the **Guarantor**).

**WHEREAS:**

(A)     Sapinda Asia holds common shares of SecureAlert, Inc., a Utah corporation (**SCRA**). The Guarantor holds the entire issued share capital in Sapinda Asia.

(B)     SCRA and the Seller are contemplating to enter into a share purchase agreement regarding the entire issued share capital of G.P.S. Global Tracking & Surveillance System Ltd., a limited liability company under the laws of Israel, against an aggregate purchase price valued at USD 8,000,000 consisting of an amount in cash of USD 500,000 and a number of shares in the capital of SCRA representing a value of USD 7,500,000 in the aggregate, which is expected to be signed and closed on April 1st 2014  (respectively, the **Reference Transaction** and the **Reference Transaction SPA**).

(C)     In connection with the Reference Transaction, on March 16, 2014, Sapinda Asia (as purchaser) and the Seller (as seller) entered into a certain Loan Agreement.

(D)     Now, Sapinda Asia wishes to grant to the Seller a put option in respect of the shares in the capital of SCRA which shall be issued to the Seller pursuant to the Reference Transaction SPA, to the extent issued, representing a value of USD 5,900,000 in the aggregate at the moment of acquisition thereof by the Seller in accordance with the Reference Transaction SPA, on the terms and subject to the conditions of this agreement.

**IT IS HEREBY AGREED** as follows:

**1.      DEFINITIONS**

1.1     The following words and expressions have the following meanings for the purposes of this agreement:

**Business Day** means the working day of the week which is not on weekend and which is not a bank holiday in Israel, Hong Kong, or London.

**Closing Date** means the day of the closing of the Reference Transaction

**Exercise Date** means the date on which the Seller serves an Exercise Notice;

**Exercise Notice** means a notice substantially in the form of Schedule 1;

**Option Expiration Date** means a day which is 30 days after the third anniversary of the Closing Date of the Reference Transaction;

**Put Option** means the option granted by Sapinda Asia to the Seller under clause 2;

**SCRA Shares** means the following common shares in the capital of SCRA:

    (i)      The Restricted Stock, as such term is defined in the Reference Transaction SPA;

    (ii)     The First Contingent Stock, as such term is defined in the Reference Transaction SPA, to the extent issued to the Seller; and

    (iii)    The Second Contingent Stock, as such term is defined in the Reference Transaction SPA, to the extent issued to the Seller.

**Strike Price** means a price of USD 20 per SCRA Share.

**2.**      **GRANT OF THE OPTION**

Conditional upon the closing of the Reference Transaction, Sapinda Asia hereby grants to the Seller the Put Option to sell and transfer to Sapinda Asia part or all SCRA Shares against the Strike Price per share, at the Seller's sole and absolute discretion in accordance with terms and conditions of this Agreement.

**3.**      **EXERCISE OF THE OPTION**

3.1     The Put Option becomes exercisable upon the Option Expiration Date.

3.2     The Seller may only exercise the Put Option by serving an Exercise Notice to Sapinda Asia on or before third anniversary of the Closing Date, provided that if such notice is served prior to the third anniversary of the Closing Date, it shall be deemed to be delivered on the third anniversary of the Closing Date.

3.3     Exercise of the Put Option shall oblige Sapinda Asia to purchase from the Seller a number of SCRA Shares as indicated in the Exercise Notice against payment of the Strike Price per SCRA share. The Closing of the sale of SCRA Shares to Sapinda Asia shall be held on the Option Expiration Date (or, if such day is not a Business Day, on the next Business Day), or any other date mutually agreed by the parties.

3.4     The transfer of SCRA Shares pursuant to the Put Option shall be effected by the Seller delivering or procuring the delivery of the respective SCRA Shares to Sapinda Asia in an "electronic" method of transfer (not by transfer of a hard-copy stock certificate). In the event that the SCRA Shares are not registered upon the Exercise Date, the Put Option shall extend until the SCRA Shares are registered. The parties shall cooperate in good faith to make all arrangements and provide all documents and instruments required to allow the transfer of the SCRA Shares pursuant to the Put Option. The SCRA Shares shall be sold and transferred free from all liens, charges, equities and encumbrances, other than under law or under the organizational documents or agreements of SCRA.

**4.**      **WARRANTIES**

The Seller warrants to Sapinda Asia that on the Option Expiration Date the following is correct:

    (a)     The Seller has full and unencumbered title to the respective SCRA Shares other than under law or under the organizational documents or agreements of SCRA;



(b)     The respective SCRA Shares are not subject to rights of third parties or obligations to transfer to third parties or claims based on contracts of any nature other than under law or under the organizational documents or agreements of SCRA.

(c)     By the transfer of the SCRA Shares to Sapinda Asia, the full and unencumbered title to the SCRA Shares is transferred to Sapinda Asia other than under law or under the organizational documents or agreements of SCRA.

Sapinda Asia and the Guarantor warrant and represent to the Seller that on the date hereof and on the Option Expiration Date the following is correct:

(a)     Sapinda Asia is a limited liability company duly organized, validly existing, and in good standing under the laws of the British Virgin Islands.

(b)     This Agreement constitutes the legal, valid, and binding obligation of Sapinda Asia and the Guarantor, enforceable against each of them in accordance with its terms. Each of Sapinda Asia and the Guarantor has the absolute and unrestricted right, power, and authority to execute and deliver this Agreement.

(c)     The execution, delivery and performance of this Agreement by Sapinda Asia and/or the Guarantor will not conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under or give rise to any right or obligation under, any provision of (i) the incorporation documents of Sapinda Asia or SCRA; (ii) any applicable law; or (iii) any contract.

(d)     Sapinda Asia and the Guarantor are not and will not be required to obtain any consent from any third party in connection with the execution, delivery and performance of this agreement.

(e)     Sapinda Asia shall acquire the shares  not with a view to their distribution as an underwriter or a placement agent.

(f)     Notwithstanding anything contained in this agreement to the contrary, Sapinda Asia acknowledges and agrees that the Seller is not making any representations or warranties whatsoever, express or implied with respect to SCRA, beyond those expressly given by the Seller in **Section 4** above, and Sapinda Asia acknowledges that, except for the representations and warranties contained therein, the shares shall be transferred on an "as is" basis. Any claims Sapinda Asia may have for breach of representation or warranty shall be based solely on the representations and warranties of the Seller set forth in **Section 4**.

(g)     Sapinda Asia and the Guarantor agrees and acknowledges that the Seller has entered into the Reference Transaction in reliance on Sapinda Asia and the Guarantor's representations, warranties and undertakings  set forth in this Agreement, and without such representations, warranties and undertakings, the Seller would not have entered into the Reference Transaction.

(h)     A true and correct letter by Sapinda Asia's bank evidencing sufficient funds is attached hereto as **Schedule 2**.



4

**5.      PAYMENT OF THE STRIKE PRICE**

At the closing of the sale of the SCRA Shares in accordance with Section 3 above, Sapinda Asia shall pay in full the respective Strike Price for the respective SCRA Shares by wire transfer of immediately available funds in US$ to the Seller's bank account.

**6.      ENJOYMENT OF RIGHTS ATTACHING TO THE SCRA SHARES**

Until such time the SCRA Shares are transferred, the Seller shall be entitled to exercise the rights attached to the SCRA Shares the Seller holds and shall be entitled to receive and retain all dividends and other distributions in respect of those SCRA Shares.

**7.      GUARANTEE**

In consideration of the Seller and Sapinda Asia agreeing to enter into this agreement, the Guarantor irrevocably and unconditionally guarantees to the Seller and Sapinda Asia the due and punctual performance of the obligation of Sapinda Asia to purchase the SCRA Shares and pay the Strike Price per share pursuant to this agreement. The Guarantor shall pay to the Seller, promptly on demand any part of the Strike Price Sapinda Asia is at any time liable to pay to the Seller under or pursuant to this agreement and which has not been paid by the Purchaser in default of this agreement. The Guarantor's obligations under this clause 7 are primary obligations and not those of a mere surety and the Guarantor shall not have any right of protest or other similar right.

**8.      COSTS**

Each party to this agreement shall bear its own costs and expenses with respect to the preparation and negotiation of agreement and with respect to the transfer of SCRA Shares.

**SIGNATORIES**

SIGNED by:
**MR E. SABAG**

)
)

SIGNED by: Tatiana Cohen
For and on behalf of
**SAPINDA ASIA LIMITED**

)

SIGNED by:
**MR L. WINDHORST**

)

6

## SCHEDULE 1

### FORM OF EXERCISE NOTICE

To:

**SAPINDA ASIA LIMITED**
To the attention of Ms. Theresa Tsang
Rooms 803-4, 8/F
Hang Seng Bank Building
200 Hennessy Road
Wanchai
Hong Kong
Fax: (852) 3764 0813
Email: ███████████████

With a copy to:

**Mr L. WINDHORST**
6th Floor
23 Savile Row
London W1S 2ET
Fax: +44 207 6479879
Email: ███████████████████

Dear Sirs,

I refer to the Put Option Agreement dated March 16, 2014 made between yourselves and me and to the Put Option granted by you to me under that agreement.

I hereby give you notice under and pursuant to the Option Agreement that I exercise the Put Option granted by you to me in respect of _____ SCRA Shares. The Strike Price in the aggregate is equal to USD _____. I ask you to transfer this amount to _____.

Yours faithfully,

SIGNED by

_____

**MR E. SABAG**

7

**POWER OF ATTORNEY**

<u>Mr L. Windhorst</u>, residing at ███████████████████████████████████████████████ on the ███
███████████████████████████████████████████ and holder of a German passport with number ██████ ███████ (the **Grantor**),

**hereby grants full power of attorney to:**

Ms T. Cohen, with the power of substitution (the **Attorney-in-Fact**),

**to, on behalf of the Grantor:**

sign and execute a put option agreement in respect of the shares in the capital of SecureAlert, Inc., a Utah corporation, representing a value of USD 5,900,000, between Mr. E Sabag, Sapinda Asia Limited (granting the put option) and the Grantor (as Guarantor) (the **Put Option Guarantee**), and to do all such other acts, deeds and things as the Attorney-in-Fact itself may lawfully do howsoever arising in connection with the Put Option Guarantee.

The Grantor shall hold harmless and fully indemnify an Attorney-in-Fact for any losses, damages and liabilities that an Attorney-in-Fact may incur in connection with the acts performed or omitted by an Attorney-in-Fact within the scope of the present power of attorney.

This power of attorney shall be governed by Dutch law.

Signed on _27_ January 2014.

**Mr L. Windhorst**

**POWER OF ATTORNEY**

Sapinda Asia Limited, a limited liability company under the laws of the British Virgin Islands, having its registered office at OMC Chambers, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands (the **Grantor**),

**hereby grants full power of attorney to:**

Ms T. Cohen, with the power of substitution (the **Attorney-in-Fact**),

**to, on behalf of the Grantor:**

(1)    sign and execute the agreement for the sale and purchase of the shares in the capital SecureAlert, Inc., a Utah corporation, (**SCRA**) representing a value of USD 1,600,000 against a purchase price of USD 1,600,000, between Mr E. Sabag as Seller and the Grantor as Purchaser (the **SPA**), and to do all such other acts, deeds and things as an Attorney-in-Fact itself may lawfully do howsoever arising in connection with the SPA;

(2)    sign and execute a put option agreement in respect of the shares in the capital of SCRA representing a value of USD 5,900,000, between Mr. E Sabag, the Grantor (granting the put option) and Mr L. Windhorst (as Guarantor) (the **Put Option**), and to do all such other acts, deeds and things as the Attorney-in-Fact itself may lawfully do howsoever arising in connection with the Put Option; and

(3)    sign and execute any agreement, deed, resolution or other document, and to do all such things an Attorney-in-Fact in her absolute discretion may reasonably deem necessary or conducive in respect of the transactions referred to above in this power of attorney.

The Grantor shall hold harmless and fully indemnify an Attorney-in-Fact for any losses, damages and liabilities that an Attorney-in-Fact may incur in connection with the acts performed or omitted by an Attorney-in-Fact within the scope of the present power of attorney.

This power of attorney shall be governed by Dutch law.

Signed on ___27___ January 2014.


**Sapinda Asia Limited**


By      : Mr L. Windhorst
Its      : jointly authorised managing director


By      : Ms T. Tsang
Its      : jointly authorised managing director